[Crim. No. 23149. June 27, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MALCOLM JOSEPH ROBBINS, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Monica Knox, Chief Assistant State Public Defender, and Michael Tanaka, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert R. Anderson, Susanne C. Wylie, Gary R. Hahn and Donald E. De Nicola, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, C. J.**—Malcolm Joseph Robbins appeals (Pen. Code, § 1239, subd. (b))[1] from a judgment of death following his conviction of the murder (§ 187) and kidnapping (§ 207) of Christopher Finney. The jury found as special circumstances that the murder was committed during a kidnapping (§ 190.2, subd. (a)(17)(ii)) and a lewd and lascivious act on a minor (§ 190.2, subd. (a)(17)(v); see § 288). We affirm.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

## I. Facts

### A. *Guilt Phase Evidence*

On the afternoon of June 15, 1980, six-year-old Christopher Finney disappeared on the way home from his father's store in Isla Vista. Christopher was last seen riding a red motorcycle driven by a blond man wearing shorts. His skeleton was found three months later. A medical examiner concluded death was caused by a broken neck—an abrupt twisting of the head and a forced separation of the cervical vertebrae.

Defendant was arrested in New Jersey in November 1980 on an unrelated matter. While in custody there, he spontaneously revealed to police officers that he had killed a young boy in California. Thereafter California law enforcement officials interrogated him about Christopher's disappearance. In a tape-recorded interview, he confessed to picking up Christopher, giving him a motorcycle ride, "having sex" and sodomizing him, and choking him to death. He said that after the sexual activity, Christopher had been angry, and had kicked him and his motorcycle's tires, at which point he became enraged and grabbed Christopher around the neck; the next thing he knew, Christopher was dead. He explained that he then collected Christopher's clothes and took them home.

Defendant's description of the manner of death was consistent with that of the pathologist. In addition, a gas station attendant had seen defendant, wearing shorts but no shirt and driving a red motorcycle, shortly before Christopher disappeared. Christopher's friend, Eric, had seen him riding the motorcycle sometime that afternoon, and gave a description of the motorcycle's driver that matched defendant. Defendant sold his motorcycle shortly after Christopher's disappearance, but failed to collect the full purchase price. He moved out of his apartment and left Isla Vista within a few days after June 15th. One of his roommates later found a boy's T-shirt in defendant's room.

While defendant was in custody in New Jersey, he was questioned by law enforcement officials from Texas, West Virginia, New York, Wisconsin, Maine, and other jurisdictions as well as New Jersey and California. He confessed to a Texas police officer that he had left California for Dallas around Christmas day, 1979, and once in Dallas, had lured Steven Little, a seven-year-old boy, into his truck where he first sodomized and, after the boy screamed, strangled him by wrapping an object around his neck. Thereafter, defendant admitted, he put Steven's body in a dumpster, lighted a fire, and left. Steven's unclothed body was found in a burning dumpster behind a department store at 1 a.m. on December 28, 1979. Throughout the confes-

sion, defendant disclosed several details that only the culprit could have known. An autopsy performed on Steven Little revealed that he had been sodomized, that he had been dead at the time of the burning, and that he had died from ligature strangulation.

Defendant pleaded not guilty to the California charges. At his trial for Christopher's murder, the Dallas offense evidence was introduced in the prosecution's case-in-chief to establish defendant's intent to engage in lewd and lascivious conduct with, and intent to kill, Christopher. The defense theory was that although defendant had killed Christopher, there had been no sexual activity nor any sexual motive for the killing, and the killing was neither deliberate nor intentional. Counsel argued defendant had picked up Christopher simply for companionship (because he was socially more at ease with children than adults) and that he had killed Christopher in a frustrated rage when Christopher kicked his motorcycle.

Although defendant had confessed to sodomizing as well as strangling Christopher, at trial he sought to demonstrate that he often confessed falsely, and he attempted to establish an alibi for the Dallas crime to which he had confessed. The alibi evidence was as follows: Defendant was seen in Palm Springs early on December 26, and kept a doctor's appointment there at 4 or 5 p.m. on December 28. The Dallas victim was last seen near his home at 5 or 6 p.m. on the 27th. The dumpster fire was started between 11 p.m. on the 27th and 1 a.m. on the 28th. The distance between Dallas and Palm Springs is 1,380 miles. Estimates of driving time between the two points ranged from 18 to 25 hours. In sum, the alibi evidence made it questionable but not impossible that defendant was in Dallas at the critical times. The credibility of this evidence, however, was seriously cast in doubt by the impeachment of one of the defense witnesses with his prior statement to the police that defendant had taken a short trip to Texas at the end of December.

The remainder of defendant's evidence consisted of testimony about his character and mental state from expert and lay witnesses. Acquaintances, most of whom were homosexual lovers during the period from 1978 to 1980, described him as immature, cocky, and craving attention. They described a tendency to exaggerate, to brag of his exploits, and to fantasize events and relationships.

Several friends described defendant's fascination with police officers and police work. One former lover, a security guard, described defendant and others driving around Los Angeles, pretending they were assisting homicide detectives in stalking the "freeway killer." Defendant's interview with the

California officers in New Jersey contained numerous references to his friendly contacts with police.

The defense experts' testimony was rather inconsistent with the theory that defendant had not sexually molested Christopher. They described him as having borderline intelligence and suffering from severe emotional problems resulting from a childhood of neglect and sexual abuse. They revealed that he began to abuse other children at an early age, while he was being abused and victimized himself in the various institutions in which he had been placed. As these experts explained, defendant is capable of simultaneously identifying with a child as victim, and victimizing that child to strike back at those who hurt him. They described his "primary diagnosis" as pedophilia.

One expert witness believed defendant would confess to crimes he had not committed because of a general sense of guilt typical of abused children. Dr. Coburn, a psychiatrist, thought defendant would also have confessed out of a desire to please the police and to help them solve a crime, and out of gratitude for the attention he was receiving from them.

All defense expert witnesses stated that even if there had been a sexual motive for the encounter with Christopher, the killing was probably unintentional. Whether Christopher was killed for kicking the motorcycle or for resisting sexual advances, the witnesses believed defendant was in an unthinking rage and could not have intended to kill.

On rebuttal, the prosecution sought to disprove the theory that defendant confessed falsely to please the authorities by introducing evidence of three interviews in which defendant refused to confess to unsolved crimes. In one of these cases, it was later definitively established defendant could not have been the culprit. Additionally, a New Jersey officer testified defendant had denied guilt of a New Jersey offense for some time before confessing to the California killing. The prosecution argued that on this record one could conclude defendant confessed only to those crimes of which he was guilty.

## B. Penalty Phase Evidence

The prosecution presented evidence of two additional sexually motivated murders of boys during 1980. The first victim was 17-year-old Brian Lepko, who disappeared from his home in Wheeling, West Virginia, on January 29, 1980. Brian's mother testified that her son had left for a party with a man who was supposed to buy his car, a blue Nova. The Nova was registered to defendant in Maine on February 4, 1980. There had been guilt phase testi-

mony that defendant was seen driving a car of that description in California in early 1980.

Brian's disappearance was not solved until defendant was arrested in New Jersey in November 1980 and confessed to the killing. He told police he had stabbed Brian in the stomach in self-defense and had then driven Brian's body to Maine, where he tried to bury it but was unable to do so because the ground was frozen. Defendant gave Brian's wallet to Mr. Freeman, one of his mother's former boyfriends whom defendant believed to be his father. On hearing defendant's account of what had happened, Freeman advised him to register the car in his own name.

With assistance from defendant, the Maine authorities found Brian's body in February 1981. A pathologist testified that the cause of death was stab wounds to the head and back, rather than to the front of the body.

The second victim was nine-year-old Evan Bailey of Vineland, New Jersey, whose disappearance in November 1980 led to defendant's arrest and confessions. Again, the body was found after defendant led authorities to it and described what had happened.

The autopsy of Evan Bailey showed a cut throat and several other stab wounds and blows. There was also evidence of sodomy. In his confession, defendant described vividly how he sodomized Evan, beat him when he resisted, pursued him when he ran away, and finally stabbed him so he would not be able to identify his attacker.

The defense presented evidence to the jury of defendant's history—a picture of parental neglect, abuse and institutional mistreatment for his first 17 years:

Defendant was 20 years old at the time of the various killings. A sociologist from Bowdoin College who had studied defendant's family as part of a study of economically depressed areas in Maine described his environment. Defendant's grandmother (who like his mother and himself was raised on welfare) grew up in a home of 11 children with no father. She first became pregnant at 16, and had 6 children including defendant's mother. Though the grandmother brought many people into her home—both boyfriends and other children—there was often not enough food for her own children.

Like her own mother, defendant's mother became pregnant while young, spent most of her life on welfare, and worked occasionally in a bar/brothel in Rockland. She had children by at least two of the Robbins brothers, Donald and Malcolm, who were among the people her mother had brought

home. Both Robbins brothers were in prison when defendant was born, and defendant's mother was living with another man at the time. Defendant's mother's first child had been taken to a hospital suffering from malnutrition. She had two subsequent husbands during defendant's early childhood, both of whom sexually molested him.

Defendant did not start walking until the age of three. He was expelled from kindergarten for misbehavior when he was five, an age at which (according to the testimony of a psychologist) it is very unusual for children to function so badly in a peer setting. A police officer who had arrested most of defendant's relatives on numerous occasions and who had often brought defendant home as a child, described the home as filthy and piled with garbage. Defendant himself was always unkempt, dirty, and friendless. This description was confirmed by a school social worker who had befriended defendant when he was in the fourth grade and had attempted to interest his mother in defendant's truancy problem. The mother, however, wanted defendant sent to reform school because she did not care to be bothered further by public school authorities.

Defendant's seven-year institutional history began in 1971, at age eleven, when his mother placed him in the "Boys Training Center." At his intake interview, defendant stated he was there to learn to control his temper and violent behavior. There was no discussion of sexual abuse; several staff members from the training center testified that that subject was neither discussed nor considered in the early 1970s.

From the training center, defendant was sent to a children's psychiatric unit at Pineland Hospital for a 30-day evaluation, but he remained there for 9 months. Pineland, however, provided essentially custodial care in a physical plant originally designed as a maximum security facility for retarded adults. The staff had little, if any, professional training; most had worked with the retarded adults for whom Pineland was originally founded. Accordingly, they saw their role as purely custodial.

Eventually, Pineland returned defendant to the training center, reporting only that it did not have sufficient external controls to deal with him. The training center released him on "entrustment" (equivalent to parole) in 1973. He was returned in 1974, following two serious sexual attacks on younger boys. The returning papers, however, did not mention these sexual assaults, and the training center staff did not learn of them.

Defendant's behavior deteriorated badly in the fall of 1974. He spent a great deal of time in isolation, during which he made at least one nearly successful suicide attempt and cut himself several other times. No one

discussed the suicide attempt with him. The institution's psychiatrist prescribed antipsychotic medications.

Defendant was released again in April 1975 and returned in September of that year following yet another sexual assault on a young boy. The judge ordered an evaluation before the disposition hearing, and the training center recommended he be sent to the Bangor Mental Health Center, because a hospital setting was more appropriate for him than a correctional facility. The hearing, however, resulted in a recommitment to the training center. Though the training center could have referred defendant to Bangor, it never did so. A staff psychologist from the training center testified he could not explain this inaction.

Defendant ran away from the training center. He was promptly returned, and remained there for six months before a "staffing report" was prepared. No one who had recommended he be sent to Bangor was involved in that staffing report. Defendant spent the next year in custodial care at the training center.

In August 1976 defendant was released to the custody of an aunt who was then married to one of his mother's former husbands. The husband was a dump picker who collected used car parts and junk metal for resale. Defendant evidently became handy with engines during this period. In October he was arrested again for a child molesting incident that occurred during a visit with his mother. He was ordered to remain with his aunt, subject to supervision by a training center psychologist. The psychologist was concerned about defendant's aggressive behavior and his preoccupation with weapons. A structured residential placement was recommended. The court, however, continued to leave defendant with his aunt, even following another molestation incident in June 1977.

Defendant's involvement with the Maine authorities ended with their decision not to rearrest him for the latter incident. Guilt phase testimony established that he then began a series of brief liaisons with older homosexual men which led him to California in 1978. He spent 1978 and 1979 living in Palm Springs with a 40-year-old man whom witnesses described as "controlling." He lived briefly with another man in Palm Springs in late 1979, and with a security guard in Los Angeles in the summer of 1980. He and the security guard moved to Santa Barbara in June. The security guard left three days later, shortly before Christopher Finney was killed. The period between Christopher Finney's death in June 1980 and Evan Bailey's disappearance in November is sketchy, but it appears defendant travelled to New Jersey with another older man.

Several psychologists and a psychiatrist testified about the effect of defendant's upbringing on his development. They described his violent behavior and lack of control as the result of his early lessons that when a person becomes angry he behaves violently. They also described the effect of sexual abuse on a child's self-esteem and sense of control. Dr. Niedorf, the former director of the psychiatric unit at Pineland, testified that the combination of sexual abuse and inattention left defendant filled with rage, shame, and an enormous need for tenderness. The witnesses explained that defendant, like other people with similar childhood experience, was unable to differentiate between tender and violent feelings. Any emotional arousal could turn instantly into an urge to crush and destroy.

## II. GUILT PHASE ISSUES

### A. Other Crimes Evidence

Before trial, defendant moved to exclude evidence of the Dallas offense under Evidence Code section 1101.[2] As noted above, the prosecutor proposed to use this evidence to establish, inter alia, defendant's intent to engage in lewd and lascivious conduct with Christopher. Such intent, he noted, was required to be established in order to prove the kidnapping charge[3] and both of the felony-murder special circumstances: section 190.2, subdivision (a)(17)(ii) (murder committed during a kidnapping) and section 190.2, subdivision (a)(17)(v) (murder committed in order to further an independent felonious purpose of committing lewd and lascivious conduct). (See *People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468].) In addition, the prosecutor argued the Dallas offense evidence was admissible to establish the People's first degree murder theory in that it showed the present homicide was intentional rather than accidental, and was the product of premeditation and deliberation.

---

[2] That section states in pertinent part: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .) other than his disposition to commit such an act. . . ."

[3] Section 207, subdivision (b) provides that "[e]very person, *who for the purpose of committing any act defined in Section 288,* hires, persuades, entices, decoys, or seduces by false promises, misrepresentations, or the like, any child under the age of 14 to go out of this country, state, or county, or into another part of the same county, is guilty of kidnapping." (Italics added.) Because the evidence showed that Christopher went willingly with defendant on his motorcycle, this statute was the only one under which a kidnapping charge could have been sustained.

■ In *People* v. *Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883], we held, "[a]s with other types of circumstantial evidence, . . . admissibility [of other crimes evidence] depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence." (*Id.*, at p. 315.)

■ First, the record satisfies us that defendant's lewd intent and his intent to kill were disputed material issues. (See *People* v. *Kelley* (1967) 66 Cal.2d 232, 242-243 [57 Cal.Rptr. 363, 424 P.2d 947] ["Such evidence is admissible in cases where the proof of defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident"]; see also *People* v. *Tassell* (1984) 36 Cal.3d 77, 88, fns. 6 & 7 [201 Cal.Rptr. 567, 679 P.2d 1], and cases cited.)

We are also satisfied that the evidence in question was relevant to those material intent issues. ■ To be relevant, an uncharged offense must tend logically, naturally and by reasonable inference to prove the issue(s) on which it is offered. (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366], and cases cited; *Thompson, supra*, 27 Cal.3d at p. 316.) ■ We have long recognized "that if a person acts similarly in similar situations, he probably harbors the same intent in each instance" (*Thompson, supra*, 27 Cal.3d at p. 319; *People* v. *Pendleton* (1979) 25 Cal.3d 371, 376-378 [158 Cal.Rptr. 343, 599 P.2d 649]; *People* v. *Schader* (1959) 71 Cal.2d 761, 777 [80 Cal.Rptr. 1, 457 P.2d 841]; *Kelley, supra*, 66 Cal.2d 232, 242-243), and that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent. The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution. (See *Schader, supra*, 71 Cal.2d 761, 777; Imwinkelried, Uncharged Misconduct Evidence (1984) § 4:01.)

The reasoning underlying use of an actor's prior acts as circumstantial evidence of that actor's later intent is well explained by Wigmore. It is based on "the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results,

the less likely is the abnormal element likely to be the true explanation of them. [¶] . . . In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act; and the force of each additional instance will vary in each kind of offense according to the probability that the act could be repeated, within a limited time and under given circumstances, with an innocent intent." (2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, at p. 241; see also Wydick, *Character Evidence: A Guided Tour of the Grotesque Structure* (1987) 21 U.C. Davis L.Rev. 123, 166-169; Imwinkelried, *supra*, § 4:01.)

It has been observed that when evidence of an uncharged offense is introduced to prove intent, the prosecution need not show the same quantum of "similarity" as when uncharged conduct is used to prove identity. (*People* v. *Curry* (1977) 76 Cal.App.3d 181, 185 [142 Cal.Rptr. 649]; *State* v. *Johns* (1986) 301 Ore. 535 [725 P.2d 312, 322]; Imwinkelried, *supra*, §§ 5:04-5:07, and cases cited; but see *Thompson, supra*, 27 Cal.3d 303, 319, fn. 23.) Here, the Texas crime evidence was substantially similar to the charged offense, and hence sufficient to raise an inference that the recent offense was committed with the charged intent(s). (Imwinkelried, *supra*, §§ 5:07-5:08.) As to the Texas crime, the evidence showed defendant lured the seven-year-old boy into a truck, sodomized him, and then strangled him to death. The evidence also showed defendant lured six-year-old Christopher Finney onto his motorcycle, sexually molested him, and then killed him by strangling him.[4] This evidence supports the court's implicit determination that "each link of the chain of inference between [(i) the similarity of the two offenses and (ii) the issue(s) for which the evidence was proffered] is reasonably strong." (*Schader, supra*, 71 Cal.2d 761, 775; see also *Thompson, supra*, 27 Cal.3d 303, 316.)

 Nor, finally, can we agree that the court abused its discretion by failing to exclude the Texas evidence under Evidence Code section 352, or under any other similar rule or policy.[5] Although defendant

---

[4] We reject defendant's suggestion that the precise method of strangulation—in the Texas crime, by an object wrapped around the victim's neck, and in the present case, by "severe twisting of the spine and neck"—renders the two incidents insufficiently similar to support admission.

[5] There has been debate whether, as here, a single incident of uncharged misconduct is sufficient to justify admission to prove intent as to the charged crime under the "chances" theory. We agree with the Oregon Supreme Court that "no categorical statement can be made one way or the other. Depending upon the circumstances of the case, sometimes one prior similar act will be sufficient . . . . A simple, unremarkable single instance of prior con-

admitted the asportation and the homicide of Christopher, he denied having done so with lewd intent, or with intent to kill. The court could properly conclude that the potential for prejudice was outweighed by the probative value of the evidence on this crucial point. (See McCormick, Evidence (3d ed. 1984) § 190, p. 565.)

### B. Instructions and Argument on Defendant's Failure to Disclose Defense Witnesses' Interview Evidence

The defense called three witnesses to provide an alibi for the Dallas offense. Donald Bicknell, a former lover, testified he spent part of Christmas Day with defendant and that defendant was still in Palm Springs on December 26. Steven Erskine testified he met defendant and Bicknell at a party on Christmas Day and spent that night with them, leaving at 6 a.m. on the 26th; he saw defendant again sometime after 8 p.m. on the 28th. William Elliott, M.D., a Palm Springs surgeon who treated defendant for a broken wrist in mid-December, testified defendant kept a 4 p.m. appointment with him on December 28. He stated defendant could have arrived as late as 5 p.m. for that appointment.

Both Bicknell and Erskine testified they had previously been interviewed by a defense investigator and that their interviews had been tape recorded. At the conclusion of those two witnesses' testimony, the prosecutor requested the defense furnish him with the tapes, pursuant to section 1102.5.[6] Claiming it would violate his client's privilege against self-incrimination, counsel declined to obey a court order to relinquish the tapes, even to the judge in camera.

Immediately thereafter, the court informed the jury of defense counsel's refusal to obey the court's order, and told the jury it would later be instructed on "what consideration, if any, you should give [that fact] in your deliberations."

At the conclusion of the guilt phase, the court instructed the jury, "the attorney for the defendant has refused to obey a direct order of the Court to produce materials for the Court's inspection. You are instructed that you

---

duct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify. These decisions must be made case-by-case . . . ." (*State* v. *Johns, supra,* 725 P.2d 312, 324, citing Imwinkelried, *supra,* § 5:06.)

[6]That section, enacted in 1982, provides in relevant part that "[u]pon motion, the prosecution shall be entitled to obtain from the defendant or his or her counsel, all statements, oral or however preserved, by any defense witness other than the defendant, after that witness has testified on direct examination at trial. At the request of the defendant or his or her counsel, the court shall review the statement in camera and limit discovery to those matters within the scope of the direct testimony of the witness."

may consider such refusal in determining the credibility of matters covered by the witnesses Donald Bicknell and Steven Erskine in their direct examination. As a result of this refusal to produce the materials requested by the Court, you are instructed that you should view the testimony of the witnesses, Donald Bicknell and Steven Erskine on direct examination with caution." In his closing argument, the prosecutor took full advantage of the court's rulings and instructions.[7]

■ In *In re Misener* (1985) 38 Cal.3d 543 [213 Cal.Rptr. 569, 698 P.2d 637], a majority of this court invalidated section 1102.5 on the ground it contravened the state constitutional privilege against self-incrimination. (*Id.*, at p. 558.) Defendant asserts *Misener* is retroactive, and that it requires reversal here. The Attorney General argues *Misener* should be overruled. We need not address this contention, because any error under *Misener* was clearly not prejudicial to defendant.

First, the instruction (and the prosecutor's emphasis thereon) focused on the testimony of only two witnesses who were called solely to provide an alibi for the Dallas offense. Neither witness, however, succeeded on direct examination in narrowing the time gap between defendant's last sighting in Palm Springs and Steven Little's disappearance in Dallas to less than 36 hours. With a gap of this length, impeachment may have been superfluous. Second, witness Bicknell was impeached by a prior statement he had given to *police* investigators that defendant had gone to Texas with a companion during the critical time period. Finally, defendant's strongest alibi evidence remained unimpeached. Dr. Elliot placed defendant in Palm Springs no more than 18 hours after the earliest time at which he (or Steven Little's killer) could have left Dallas. There was no request for Dr. Elliot's prior statements to the defense, and there was no instruction or argument that his

---

[7]He argued, "[Defense counsel] would have you believe he's the great crusader for his client and he'll be willing to do whatever the Judge is going to do to him because he wouldn't turn over information to the Court, so the Court could examine it, not me, to see whether it should be turned over to the People, involving what two witnesses, lo and behold, Mr. Erskine and Mr. Bicknell. [¶] Now he's willing to play tapes on [another prosecution witness] when it serves his purpose, and he's willing to flop over here in front of me everyday and bring up new evidence and information for me to try to assimilate when they're taking the stand, evidence that we've never seen. [¶] But when you get down to the nitty-gritty of the two people they're relying on to try and convince you that this guy was never in Texas, all of a sudden he's going to stand on his principles, because he doesn't want us to find out what's in those tapes. Why? Because it might reveal how his recollection was refreshed, or how, between the interview they suggested things to him to refresh his recollection about things he never remembered. How do we know? That's simply why you ought to do what the Court said. You ought to view that testimony with caution, because we don't know what's on those tapes. And before you accept the poppycock that this is a crusade on [defense counsel's] part, I think you ought to put that in light of the rest of his behavior when it was convenient for him to use those kinds of devices in this trial."

testimony should be viewed with distrust. We conclude it is not reasonably probable a result more favorable to defendant would have occurred in the absence of the asserted instructional error and arguments thereon. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### C. Prosecutor's Compliance With Discovery

Before trial, the prosecution was ordered to disclose to defendant (i) "all statements and utterances by defendant, oral or written, however recorded and preserved, whether or not signed or acknowledged by the defendant" and (ii) "the 'sign-in or identification lists' of the New Jersey County Jails indicating the names and times of those individuals who visited or interviewed MALCOLM ROBBINS during November and December [1980] . . . and January of [1981]."

As noted above, defendant met the prosecution's case-in-chief (including the California and Texas confessions) by presenting evidence that he tended to confess falsely in order to please the police. In fact, the heart of his defense was the falsity of the Texas confession.

In rebuttal, the prosecution presented three law enforcement officials—from Maine, New York, and Wisconsin—who had questioned defendant during his incarceration in New Jersey about sex crimes involving young boys. In these sessions, defendant had denied involvement in any of the cases and apparently was no longer a suspect in some of them.[8] The officer from Wisconsin testified defendant "said that he would say whatever he could say about any case, but that he wasn't going to take the rap for something he hadn't done."

The defense objected to the officer's testimony on the ground counsel had not received discovery of any of the three interviews. Counsel argued he had formulated his defense strategy on the assumption that defendant had made numerous *false* confessions, that he sought discovery to determine if there was anything inconsistent with this pattern of false confessions, and that incomplete discovery had led him to believe that there was not. Defendant therefore sought to exclude the proffered testimony.

The prosecutor responded that the requested lists did not exist; that the interviews in which defendant refused to confess were not "statements" and were beyond the scope of the first part of the discovery order; that he had not become aware of these interviews until after the defense evidence was

---

[8]The guilt phase record leaves it unclear whether defendant was still a suspect in the Maine case. Evidence of the Maine case was introduced later at the penalty phase.

presented; and that the defense had been, and must have been, aware of these interviews before trial. Finally, the prosecutor asserted he had believed that the defense had wanted a list that would show the dates and times at which defendant was interviewed—and that such a time sheet could not have been reconstructed from the material available to him.

The court found no bad faith on the prosecutor's part in complying with the discovery order, and refused to exclude the rebuttal evidence. The court granted a 24-hour continuance and ordered the prosecutor to provide defendant with the witnesses' original police reports.

■ Defendant now asserts the prosecutor failed to comply with the discovery order and that the rebuttal testimony should have been excluded, or, at least, he should have been granted more than a 24-hour continuance. The People contend there was no failure to comply, because the order could not validly require the prosecutor to provide items of which he was unaware or that were in the possession of other jurisdictions.

*Assuming* the trial court erred in concluding the prosecution adequately complied with the discovery order, reversal is not warranted here. First, the usual remedy for noncompliance with a discovery order is not suppression of evidence, but a continuance. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 502 [116 Cal.Rptr. 217, 526 P.2d 225].) Second, *assuming* the 24-hour continuance was inadequate to dispel any prejudice resulting from the prosecution's conduct, any error was harmless.

Contrary to defense counsel's representations that he might have prepared a different defense had he been aware of behavior inconsistent with the assumed pattern of false confessions, we strongly doubt he would have done so. Once the confession to the present crime and the confession to the Dallas crime were ruled admissible, the defense had very little choice about what strategy to pursue. An effort to show that defendant tends to confess falsely—based on the alibi evidence for the Dallas offense—must have been his best hope. The alibi evidence, if successful, would have drawn the sting from the Dallas offense as "other crimes" evidence.

Most significantly, the evidence of defendant's guilt was very strong. He confessed in detail to the charged crime. Though the defense presented psychiatric evidence that he might have made some false statements in that confession, he did admit killing the boy, and counsel explicitly conceded the killing in his argument. Moreover, although counsel contested the sexual aspects of the encounter with Christopher, the testimony of his own expert witnesses undermined this position more effectively than any rebuttal evidence. Each expert offered pedophilia as a diagnosis of defendant's psycho-

logical state. Each witness thought it at least likely that defendant had a sexual motive in picking up Christopher. We conclude the evidence that Christopher's killing occurred in the course of a section 288 violation was extremely strong, and that it is not reasonably likely the rebuttal testimony cost defendant a more favorable result. (*Watson, supra*, 56 Cal.2d at p. 836.)

### III. Special Circumstance Issues

#### A. Felony Murder/Intent to Kill

The jury was not instructed to find defendant intended to kill before returning a true finding as to any of the special circumstances. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].) As we recently explained in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306], *Carlos* must be overruled in light of intervening decisions of the United States Supreme Court. We find the record establishes beyond doubt that defendant was the actual killer in this case, and hence the finding required by *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368], is satisfied. (*Cabana* v. *Bullock* (1986) 474 U.S. 376, 390-391 [88 L.Ed.2d 704, 719-720, 106 S.Ct. 689, 699-700].)

#### B. Felony Murder/Corpus Delicti

In *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887], we reversed a judgment for error at the guilt phase, but stated for guidance on retrial that, based on our interpretation of section 190.4, subdivision (a) (which specifies that any felony on which a special circumstance is based must be "charged and proved *pursuant to the general law* applying to the trial and conviction of the crime"; italics added), "the corpus delicti of felony based special circumstances must be established independently of an accused's extrajudicial statements." (37 Cal.3d at p. 94.) The People, not bothering to analyze the effect of *Mattson* on these facts, argue simply that *Mattson* should be overruled.

We see no reason to depart from our recent interpretation of the statute. We also conclude that the concerns of the corpus delicti rule are sufficiently satisfied in this case. ■ The rule, of course, requires that the corpus delicti of an offense—here, the "lewd and lascivious act on a minor" special circumstance (§§ 190.2, subd. (a)(17)(v), 288)—must be proved independently of the accused's extrajudicial admissions. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 624 [205 Cal.Rptr. 775, 685 P.2d 1126].) As *Alcala* states, "[t]he independent proof may be by circumstantial evidence [citation], and it need not be beyond a reasonable doubt. A slight or prima facie showing,

permitting the reasonable inference that a crime was committed, is sufficient. [Citations.] If the independent proof meets this threshold requirement, the accused's admissions may then be considered to strengthen the case on all issues. [Citation.]" *(Id.*, at pp. 624-625.)

■ Measured by this standard, we hold there was adequate evidence, apart from defendant's admissions, that the alleged sexual offense occurred. Defendant was seen by one witness riding a motorcycle in the area of (and on the date of) the victim's disappearance, and the victim was last seen by another witness riding a motorcycle with a man matching defendant's description; no clothes were found at the scene of the crime; defendant's own experts described his "primary diagnosis" as pedophilia; his admission of similar sexual conduct as to the very similar Texas crimes was confirmed by scientific evidence; and finally, the physical evidence of the homicide lends reliability to other aspects of defendant's confession, namely, his description of the lewd and lascivious conduct. In view of the nature of the offense and the circumstances of this case (i.e., the body was not discovered for some time, hence it was impossible to verify the sexual conduct by scientific evidence, and there were apparently no eyewitnesses to the crime) we do not believe the corpus delicti rule can be interpreted to call for more; the law does not require impossible showings.

## IV. PENALTY PHASE ISSUES

### A. Instructions and Argument on the Jury's Consideration of Mitigating Evidence and Its Exercise of Sentencing Discretion

As explained above, the jury was presented with extensive mitigating evidence from a number of defense witnesses and experts. Thereafter, it was instructed in the unadorned language of former CALJIC Nos. 8.84.1 and 8.84.2. As we explained in *People* v. *Brown* (1985) 40 Cal.3d 512, 536-544 [220 Cal.Rptr. 637, 709 P.2d 440], and *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115], such instructions, together with the arguments of counsel, may mislead the jury about the scope of its sentencing inquiry, or its sentencing discretion to decide whether death is appropriate in a given case. In all such cases tried under the former instructions, we review the record to determine the likelihood that the jury was misled in either respect. Undertaking such an inquiry here, we find no error.

#### 1. *Factor (k)*

■ Although the court did not have the benefit of our decision in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813],

and hence did not give the "expanded factor (k)" (§ 190.3, factor (k)) instruction called for in that case (*id.*, at p. 878, fn. 10), it showed remarkable prescience by giving the following instruction immediately after former CALJIC No. 8.84.1: "Evidence has been produced concerning the following: [defendant's] deprived childhood; his incarceration in mental hospitals in juvenile prisons from age 11 on; the lack of treatment for identified problems concerning aggression and sex; his release into society in spite of repeated offenses; his assistance and testimony for the prosecution in the Palm Springs child molesting case. The fact that he voluntarily confessed and assisted the prosecution in the cases in which he is charged. Any or all of the above may be considered as mitigating circumstances. . . . In this phase of the case you may consider sympathy and pity in determining whether to show mercy and compassion. Sympathy and pity can be considered as mitigating factors."

In addition, both counsel confirmed the jury's duty to consider defendant's proffered evidence as mitigating circumstances in its penalty determination. The prosecutor told the jury it was "undisputable" that defendant's character evidence did constitute "mitigating circumstances," but stressed that the weight to be given that evidence was to be decided by the jury. (See *Allen, supra,* 42 Cal.3d at p. 1276.) Similarly, defense counsel placed great emphasis on defendant's character and background evidence, and expressly defined "extenuating circumstances" as "anything that you find that points to life imprisonment as opposed to . . . death." Viewing the instructions and arguments as a whole, we conclude that a reasonable jury would not have been led to believe that the proffered mitigating evidence was to be ignored. We therefore find no factor (k) error.

### 2. *Alleged Brown Error*

■ Nor do we conclude a reasonable jury would have been misled to believe (i) its sentencing responsibility was to be discharged by a mere "counting" of aggravating and mitigating factors, or (ii) that it was permitted to arrive at its sentencing decision without having to exercise its moral discretion and decide whether death is the *appropriate* penalty for this offense and offender. (*Allen, supra,* 42 Cal.3d at pp. 1276-1277.)

As to the first consideration, we note that the prosecutor did not suggest that the jury's "weighing" of aggravating and mitigating factors called for a mechanical counting as opposed to a qualitative comparison. Indeed, he told the jury otherwise: "You have the right to attach whatever weight and significance you want as a jury to any particular factor, and you may find that one or two of the mitigating factors far outweigh five aggravating factors . . . ." Defense counsel echoed this theme: "It's not simply . . . a

matter of numbers. . . . [Y]ou as an individual juror can find that ['any one factor that argues for life'] justifies the sentence of life in prison without the possibility of parole. And that's no matter what other factors you find in aggravation . . . ."

As to the second consideration, we believe the jury properly understood its discretion and responsibility to determine whether death is "appropriate" in the context of the weighing process. The prosecutor told the jury: "It is only you, and it is your exclusive [province] as the jury to decide what weight that you are going to attach to any of the mitigating and aggravating circumstances in this particular case, and then to involve yourselves as you will in the balancing process, that will ultimately lead you to the decision as to what punishment you as a jury will render in this case against the defendant . . . ."

Similarly, defense counsel further reinforced this point: "[Y]our choice is never mandatory. There is no mandatory penalty that has to be imposed. Each of you as individuals will ultimately have to wrestle with that, ultimately have to decide in your own mind what the appropriate punishment is." He repeated that the ultimate question for the jury to decide was whether death was the "appropriate" punishment, and concluded by telling the jury it could impose death only if it was "absolutely sure [it was] doing the right thing . . ." and that it was "the right punishment, the only possible punishment." In light of the foregoing, we simply cannot imagine that a reasonable jury would have been misled about its moral discretion and sole responsibility to decide whether death is appropriate in this case.

### B. Denial of Defendant's Request to Address the Jury

The court twice (once at the time of defense counsel's penalty phase opening statement, and again immediately before defense counsel's penalty phase closing argument) denied counsel's request that his client be allowed to address the jury personally without having to take the stand and subject himself to cross-examination. At the time of the second request the court expressed concern that defendant would not be able to confine himself to proper argument, and that his statements might mislead and confuse the jury. Defense counsel made no offer of proof as to what defendant's statement would have disclosed. Defendant claims the court's ruling was prejudicial error.

Although there is no United States Supreme Court case on point, defendant claims a federal circuit court case sheds light on the issue. In *Ashe* v. *State of N.C.* (4th Cir. 1978) 586 F.2d 334, 336 (cert. den. 441 U.S. 966 [60 L.Ed.2d 1071, 99 S.Ct. 2416])—a noncapital sentencing case—the defend-

ants were convicted and sentenced in state court. They sought a federal writ of habeas corpus on the basis the sentencing court had denied their request to personally address the court before being sentenced. The federal circuit court held: "[W]hen a defendant effectively communicates his desire to the trial judge to speak to the imposition of sentence, *it is a denial of due process not to grant the defendant's request.*" (*Id.*, at p. 336.) The court offered little analytical support for its conclusion except for a brief footnote in which it suggested that three United States Supreme Court cases "seem to recognize that right." (586 F.2d at p. 336, fn. 3.)[9] *Ashe* suggested that a defendant's statement may be limited as to both duration and content: "He need be given no more than a reasonable time; he need not be heard on irrelevancies or repetitions." (*Id.*, at p. 337.) The court did not grant the requested writ, but instead remanded to the district court for an evidentiary hearing on what the defendants would have told the sentencer; it stated that if the defendants' information proved to be irrelevant or cumulative in view of their counsel's statements, denial of the right to speak would be deemed "harmless error." (*Id.*, at p. 337.)

*Assuming Ashe* is correct in its federal due process analysis, that case is distinguishable. In the noncapital sentencing context, a defendant does not generally have an opportunity to testify as to what penalty he feels is appropriate. Accordingly, *Ashe* might be correct in saying a defendant may not be denied that opportunity when he requests it. The sentencing phase of a capital trial, on the other hand, specifically provides for such testimony. The defendant is allowed to present evidence as well as take the stand and address the sentencer. Given this, we fail to see the need, much less a constitutional requirement, for a corresponding "right to address the sentencer without being subject to cross-examination" in capital cases.

One state court opinion cited by defendant seems to support his position, but that case too is distinguishable. In *Harris* v. *State* (1986) 306 Md. 344 [509 A.2d 120], Maryland's high court held a capital defendant has a right to address the sentencing jury without subjecting himself to cross-examination. Significantly, however, the court expressly stated that this right "is not a fundamental right secured by either the federal or the state constitution"

---

[9] The court wrote: "Our conclusion is strengthened by the post-*Hill* [*Hill* v. *United States* (1962) 368 U.S. 424 (7 L.Ed.2d 417, 82 S.Ct. 468)] decisions of *Mempa* v. *Rhay*, 389 U.S. 128 [88 S.Ct. 254, 19 L.Ed.2d 336] (1967) that sentencing is a critical stage of a criminal proceeding to which the sixth amendment right of counsel attaches, and *Faretta* v. *California*, 422 U.S. 806 [95 S.Ct. 2525, 45 L.Ed.2d 562] (1975), that a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. Additionally, it is established that a defendant has a constitutional right to testify in his own behalf. *Harris* v. *New York*, 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (1971). To the extent that a defendant seeks to advance legal arguments or factual matters bearing upon the sentence which should be imposed on him, these cases seem to recognize that right."

(*id.*, at p. 126), but is grounded instead on that state's common law (*id.*, at pp. 124-127). Further, the court observed that its own rules of court guaranteed the right in cases tried after 1984 (*Harris* had been tried at a time when the rules were "silent" on the issue). (*Id.*, at p. 127.) Finally, the court noted that defense counsel had made an offer of proof containing the substance of what defendant would have said if he had been allowed to address the jury. (*Id.*, at p. 123.) This offer was crucial to the court's analysis. It held that when "a defendant who timely asserts his right to allocute *and provides an acceptable proffer* . . . [, and when] the right *so asserted* is denied . . . the sentence must be vacated." (*Id.*, at p. 127, italics added.)

In contrast to *Harris*, defendant does not show that his understanding of the "right of allocution" is recognized by the "common law" of this state. Most significantly, unlike *Harris*, defense counsel here made no offer of proof. In this situation, we assume even the *Harris* court would find the issue not properly preserved. For the reasons set out above, we discern no error.[10]

### C. Other Claims

Defendant makes two additional arguments, neither of which has merit.

First, he faults the court for failing to delete from CALJIC. No. 8.84.1 the assertedly "inapplicable" mitigating factors. As we recently explained in *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250], *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127], and *People* v. *Williams* (1988) 44 Cal.3d 883, 959-960 [245 Cal.Rptr. 336, 751 P.2d 395], this is not error.

Second, he asserts the 1978 death penalty statute is unconstitutional because it fails to include a number of specific safeguards. All of these arguments have been rejected in *Allen, supra*, 42 Cal.3d 1222, 1285-1288, and *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].

The judgment is affirmed in all respects.

---

[10] Defendant advances yet another basis for his conclusion that the court erred in denying his request to address the jury: He claims he has a statutory right, under section 1200, to address the sentencing jury. Section 1200, however, merely requires the court ask the accused "whether he has any legal cause to show why judgment should not be pronounced against him." The cases cited by defendant interpreting this provision (none of which involved capital cases or sentencing juries) hold only that the court has discretion to grant or deny a defendant's request to speak. We see nothing in section 1200 suggesting a legislative intent to allow capital defendants a right, separate from the scheme set out in the death penalty statutes, to address the sentencing jury without being subject to cross-examination.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

Broussard, J., concurred in the judgment.

**MOSK, J.**—I concur in the judgment, but feel impelled to discuss one issue at greater length.

The United States Supreme Court, in a federal rule context, has emphasized "the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." (*Green* v. *United States* (1961) 365 U.S. 301, 304 [5 L.Ed.2d 670, 673, 81 S.Ct. 653].)

The right of a defendant to speak for himself has origins in the common law as far back as 1689. This is known as allocution,[1] and is recognized in virtually every jurisdiction by the usual practice of the sentencing judge asking the defendant if he has any legal cause why sentence should not be pronounced. In some states the inquiry is required by law, in federal courts by rule. (Fed. Rules Crim. Proc., rule 32 (a)(1).)

The problem we face here is whether that right of allocution applies in the penalty phase of a capital case. In the ordinary criminal case, the jury determines guilt but the judge imposes sentence. At that time he permits the defendant to personally address him on the issue of punishment. (Pen. Code, § 1200.) In a capital case, however, the jury not only finds guilt but also determines punishment, i.e., whether the defendant is to live or die. Should the defendant be allowed to personally address the jury before it reflects on the appropriate penalty? There is a paucity of authority on the subject.

In *State* v. *Jeffries* (1986) 105 Wn.2d 398 [717 P.2d 722, 739], it appears that the defendant "made an allocution to the jury" in the penalty phase of a capital case. As indicated in the opinion, he neither admitted his guilt nor asked for mercy. His only offered mitigation was his skill at wood carving. Yet that could have been a factor in the jury's consideration of whether his life should be spared. In *State* v. *Mak* (1986) 105 Wn.2d 692 [718 P.2d 407, 430], it was revealed that the "defendant was given his right to speak to the jury at the sentencing hearing without being required to take an oath . . . ."

The right of the defendant to speak before sentence is determined has been upheld in a number of jurisdictions. (See, e.g., *Tomlinson* v. *State*

---

[1] Allocution is defined as the "Formality of court's inquiry of prisoner as to whether he has any legal cause to show why judgment should not be pronounced against him on verdict of conviction." (Black's Law Dict. (5th ed. 1983) p. 39.)

(1982) 98 N.M. 213 [647 P.2d 415]; *Sellman* v. *State* (1981) 47 Md.App. 510 [423 A.2d 974]; *State* v. *Nicoletti* (R.I. 1984) 471 A.2d 613; *Mohn* v. *State* (Alaska 1978) 584 P.2d 40; *People* v. *Emig* (1972) 177 Colo. 174 [493 P.2d 368].) It has been held discretionary in other jurisdictions. (E.g., *State* v. *Burkhart* (Tenn. 1976) 541 S.W.2d 365; *Wilson* v. *State* (1947) 76 Ga.App. 257 [45 S.E.2d 709]; *Patterson* v. *State* (1926) 21 Ala.App. 357 [108 So. 265]; *State* v. *Townley* (1921) 149 Minn. 5 [182 N.W. 773].)

A thoughtful commentary on the *Tomlinson* case is helpful since the procedures in New Mexico parallel ours in California: "*Tomlinson* holds, however, that allocution is not limited to the assertion of legal bars to the imposition of a sentence. Instead, it provides the accused an opportunity to participate in the sentencing process by making a personal plea for mitigation of punishment. Because the jury, at the option of the accused, may set punishment in New Mexico death penalty prosecutions, the logic of *Tomlinson* and its historical review of the right in New Mexico jurisprudence establish that the right of allocution entitles the defendant to make his personal statement or plea to the jury which will decide his fate. The jury bases its decision on a weighing of the aggravating and mitigating circumstances proved in the case and considers the defendant and the crime in making its decision, yet always retains authority to impose a life sentence despite the results of the weighing process. Thus, New Mexico law appears to require that the accused be allowed to make some type of personal statement or plea to the jury which will decide whether he will be sentenced to death. This requirement is necessary if the right of allocution is to be meaningfully applied in capital sentencing proceedings." (Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy* (1985) 15 N.M. L.Rev. 41, 60, fn. omitted.)

Sullivan points out that "Avoidance of the death penalty may rest largely on the jury's perception of the character and personal history of the defendant. Thus, an important aspect of the right to present mitigating evidence lies in the defense's ability to present the defendant to the jury in human terms . . . by affording the defendant the opportunity to address the jury and offer personal reasons why it should impose a life sentence . . . . Once the accused elects to have the jury set his punishment, his plea should be made to the jury prior to its deliberations and not to the trial court, which merely pronounces sentence after the jury returns the verdict. The plea will likely prove an important factor in the jury's evaluation of the accused and appropriateness of capital punishment in his case." (*Id.*, at pp. 56, 60-61)

Lest it be feared by prosecutors that the defendant's right of allocution will inevitably result in a life rather than death sentence, I suggest there are numerous pitfalls for the defendant. In most capital cases the defendant is

uneducated or inarticulate; his persuasive ability will be limited. If he admits his crime after having denied it in the guilt phase, he will be perceived by the jury to be an expedient liar. If he fails to demonstrate believable remorse his presentation to the jury will probably be futile. And finally, the personality of a convicted murderer is more likely to be perceived as negative rather than attractive.

On the other hand, if the defendant can indicate some constructive worth to his life and activities, if he can reveal family devotion, if he can discuss deprived childhood and parental neglect, if he can convincingly promise good behavior in prison, he just may evoke the type of sympathy that the jury is authorized to consider.

In 3 LaFave, Criminal Procedure (1984) pages 118-119, it was noted that "Though it has been held that 'the failure to accord allocution to a defendant represented by counsel is not an error of constitutional dimension,' the Supreme Court has not yet decided whether silencing a defendant who wished to speak would be constitutionally impermissible."

On two occasions this defendant requested, through counsel, that he be permitted to address the jury before they began penalty deliberations. The trial court denied the request apparently as a matter of discretion. Under the current state of the law in California—or, more accurately, in the absence of any controlling statutory or case law—I cannot fault the trial judge for this exercise of his discretion. On the other hand the procedure is not unknown here in California. Though represented by counsel, defendant Charles Edward Moore was permitted to make his personal plea to the jury in a capital case. His automatic appeal is pending in this court. (*People* v. *Charles Edward Moore*, Crim. No. 23721.)

However, this may be an appropriate subject for the Legislature to consider in the future, i.e., whether allocution should be a matter of right in a capital case, whether it should be prohibited because defendant has counsel to speak for him, or whether it should be subject to the discretion of the trial judge and if so whether some standards should be provided for the exercise of discretion.

Appellant's petition for a rehearing was denied August 18, 1988.