Filed 4/4/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C073360 |
| v. | (Super. Ct. No. 11F05343) |
| SANTIAGO SANCHEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Geoffrey A. Goodman, Judge. Affirmed in part and reversed in part.

Maureen L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II through VI of the discussion.

1

Defendant Santiago Sanchez was convicted by jury of four sex offenses—one count of sexual penetration (Pen. Code, § 288.7, subd. (b)),[1] one count of attempted sexual intercourse (§§ 664, 288.7, subd. (a)), and two counts of lewd or lascivious conduct (§ 288, subd. (a))—committed against an eight-year-old girl, D.C.; he was convicted of two additional sex offenses—two counts of lewd or lascivious conduct (§ 288, subd. (a))—committed against D.C.'s ten-year-old sister, M.C. The jury also found defendant committed lewd or lascivious acts against more than one victim. (§ 667.61, subd. (e)(4).) The trial court sentenced defendant to serve 65 years to life in state prison and imposed other orders.

On appeal, defendant contends: (1) the evidence was insufficient to establish the corpus delicti of the crime of sexual penetration; (2) the trial court abused its discretion and violated his constitutional right to due process by excluding certain evidence he claims was admissible to impeach testimony from the victims' older brother, S.S., who saw defendant's attempt to have sex with D.C. and called the police; (3) the trial court abused its discretion and violated his confrontation, due process, and jury trial rights by allowing testimony from an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS); (4) the prosecutor engaged in prejudicial misconduct in violation of defendant's right to due process; (5) the trial court's imposition of three consecutive life terms amounted to an unauthorized sentence and a denial of due process; and (6) the cumulative effect of the foregoing assertions of error deprived defendant of his right to due process.[2]

---

[1] Undesignated statutory references are to the Penal Code.

[2] Defendant also requests that we review certain sealed school records to determine whether they contain any discoverable information that should have been made available

2

We affirm defendant's convictions and remand the matter for resentencing. As we explain, while there was no *direct* evidence of the specific act of sexual penetration defendant was convicted of committing, other than his confession during interrogation, the circumstantial evidence was more than sufficient to establish the corpus delicti of the crime. The trial court did not abuse its discretion in excluding the proffered evidence purportedly relevant to impeach S.S. or by allowing the challenged CSAAS testimony. Defendant's claim of prosecutorial misconduct is forfeited by his failure to object and request a curative instruction. Nor did defense counsel's failure to so object amount to constitutionally deficient performance. Defendant's assertion of cumulative prejudice also fails.

We do, however, agree the matter must be remanded for a new sentencing hearing. While the trial court's imposition of three consecutive life terms is not unauthorized, and therefore defense counsel's failure to object to this sentence below arguably forfeits the issue on appeal, it is apparent from the record that the trial court believed it was required to impose full, separate, and consecutive terms pursuant to section 667.6, subdivision (d), and rule 4.426 of the California Rules of Court[3] that were not applicable to this case. Assuming the issue is forfeited, we conclude defense counsel's failure to object and correct the trial court's misunderstanding amounted to ineffective assistance of counsel.

## FACTS

Defendant was 19 years old and volunteering at an after-school program when he met S.S. Despite the fact defendant was seven or eight years older than S.S., the two became friends. About a month later, defendant met S.S.'s mother, C.C., at the after-

---

to the defense. We have done so and conclude no additional information should have been made available to the defense.

[3]     Undesignated rule references are to the California Rules of Court.

school program and was invited over to their house to meet her husband, J.A., with whom defendant shared an interest in automotive repair and body work. At the house, defendant also met the other children in the household, D.C., M.C., and their younger brother, E.C. Over the course of about a year, defendant and J.A. became friends and worked on cars together. Defendant also routinely watched the children when their parents went out.

In August 2011, defendant committed the crimes involved in this case. He was 20 years old. His victims, D.C. and M.C., were eight years old and ten years old, respectively.

### *Crimes against M.C.*

Defendant stayed the night at the family's house on August 1, 2011. While watching a movie with the children in the living room, defendant touched M.C. twice with his hand on her vaginal area, over her clothes, removing it about "two seconds" after M.C. told him to "stop." The next morning, defendant was asked to watch the children while C.C. went to work and J.A. went to Pick-n-Pull. He agreed. Before J.A. left, M.C. told him defendant was "bothering" her; not understanding the seriousness of the situation, J.A. told her to "just tell him to stop bothering you." That day, the children had various chores to do. Defendant contributed by helping S.S. with the yard work. As defendant watered the front lawn, M.C. passed by him on her way to get a hedge trimmer for S.S. Defendant reached out and briefly touched her chest with the back of his hand. Believing defendant did so "on purpose" because "he was smiling," M.C. told him to "stop." Defendant responded that "he wasn't doing anything wrong." When she again passed by defendant to get a shovel for S.S., defendant again reached out and briefly touched her with the back of his hand, this time on her vaginal area. M.C. again told him to "stop." Defendant again said he "didn't do anything." Defendant confirmed in his

4

statement to police that he touched M.C.'s chest "like one time" and he touched her vaginal area "like twice," always over her clothing.

Based on these facts, as previously mentioned, defendant was convicted of two counts of committing a lewd or lascivious act on M.C., a child under the age of 14 years.[4]

### Crimes against D.C.

After defendant finished watering the lawn, the children asked to play in the swimming pool. Defendant agreed. While he and S.S. finished up the yard work, the other children went inside the house to change into swimming suits. After the children had changed, defendant went into S.S.'s bedroom to change into some shorts. The record is unclear as to whether D.C. was already in the bedroom when defendant came in, or whether she came into the room after defendant had changed. Either way, she began playing with S.S.'s guitar on the bottom bunk of the bunk beds S.S. shared with his younger brother, E.C. Defendant took the guitar away and climbed on top of her. By his own account, he pulled her swimming suit to the side to expose her vagina, and pulled up one of the leg openings of his shorts to allow him to pull out his penis. He then attempted to insert his penis into D.C.'s vagina, but was unsuccessful because his penis was not erect.

Unbeknownst to defendant, S.S. had entered the house looking for D.C. Having seen defendant touch M.C.'s buttocks on two previous occasions, S.S. decided to keep "a

---

[4] Defendant was charged with an additional count of committing a lewd or lascivious act on M.C. based on her statement he touched her buttocks while pushing her on a swing in the yard. She also testified to this event at trial. Defendant confirmed at trial that he pushed M.C. on the swing, but denied touching her buttocks and instead claimed to have pushed her back. The jury found defendant not guilty of this offense, but guilty of the lesser included offense of simple battery. We shall discuss this offense no further.

5

closer eye on him." With this purpose in mind, S.S. entered the house quietly through the back door, "snuck around the corner to check the living room," and then "went down the hallway a little." From the hallway, S.S. saw defendant on top of D.C. on the bed. Defendant's "hip area . . . was moving up and down." D.C. told defendant to "[s]top." Defendant responded: "Just go with it." S.S. "stood there for about a minute" trying to decide what to do. He considered confronting defendant, but "figured if [he] did that, that [defendant] would leave and would most likely, probably, get away with it." Instead, S.S. left the house "to go call the cops." On his way out, S.S. told M.C. to "stay outside" and that he "would be back." He then got on his bicycle and rode to a neighbor's house. When this neighbor was not home, S.S. rode to a nearby gas station and used a stranger's cell phone to call 911.

Meanwhile, according to defendant's statement to police, he stopped his assault on D.C. shortly after it began and allowed her to go outside to play with her siblings. Defendant also told police he penetrated D.C.'s vagina with one of his fingers while giving her a piggyback ride down the hallway. His statement is unclear as to when exactly this took place, except that it happened before he tried having sex with her and she was already wearing her swimming suit. Regardless of the precise timing, defendant admitted: "I was tryin[g] to put it in there. My finger." He also admitted he succeeded in penetrating D.C.'s vagina with his finger. When asked whether it turned him on, defendant answered: "Uh, yes, a little." When asked whether it probably caused him to then try something more with D.C., defendant responded: "Yeah."

Based on these facts, as previously mentioned, defendant was convicted of one count of sexual penetration, one count of attempted sexual intercourse, and two counts of committing a lewd or lascivious act on D.C., a child under the age of 14 years.

6

Police arrived at the house a short time after S.S. made the call to 911. Defendant was taken into custody, advised of his *Miranda* rights,[5] and questioned. He eventually admitted to touching M.C.'s vagina and chest over her clothes, penetrating D.C.'s vagina with his finger while giving her a piggyback ride, and attempting to penetrate her vagina with his penis while on the bed. Defendant also wrote down that he "made a mistake" when he "tr[ied] to put something in [D.C.]," but he "was not thrusting" and stopped when she told him to stop. He also wrote a letter apologizing to the family for his actions.

DISCUSSION

I

### *Sufficiency of the Evidence to Establish the Corpus Delicti of Sexual Penetration*

Defendant contends the evidence was insufficient to establish the corpus delicti of the crime of sexual penetration. He is mistaken.

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.] Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law. [Citation.] California decisions have applied it at least since the 1860's. [Citation.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).) "The purpose of the corpus delicti rule is to assure that 'the accused is

---

**5**    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

7

not admitting to a crime that never occurred.'" (*People v. Jones* (1998) 17 Cal.4th 279, 301 (*Jones*), quoting *People v. Jennings* (1991) 53 Cal.3d 334, 368 (*Jennings*).)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Alvarez*, *supra*, 27 Cal.4th at p. 1171; *People v. Robbins* (1988) 45 Cal.3d 867, 885-886 (*Robbins*), superseded by statute on another ground as stated in *Jennings*, *supra*, 53 Cal.3d at p. 387, fn. 13.)

Defendant argues: "There was no evidence of count one, digital penetration of [D.C.] when she was on [defendant's] back (§ 288.7, subd. (b)), other than [defendant's] own admission, in the course of the police interrogation, that he had touched her in that way while giving her a piggyback ride." We agree defendant's admission is the only *direct* evidence of the digital penetration. D.C. did not testify to this specific criminal act and did not reveal it in the Special Assault Forensic Evaluation (SAFE) interview. Nor did anyone else witness the crime. Nevertheless, we conclude the circumstantial evidence is more than sufficient to establish the corpus delicti of sexual penetration. In so concluding, we find three decisions of our Supreme Court to be particularly instructive.

In *Jones*, *supra*, 17 Cal.4th 279, the defendant and another man, Trone, abducted the victim and committed various sex offenses against her, including forcible rape and forcible oral copulation, before the defendant shot her in the head and left her to die on

8

the side of an isolated road. (*Id.* at pp. 291-292.) The defendant admitted to police that Trone forced the victim to orally copulate him in the backseat while the defendant drove. Accordingly, in addition to murder and other crimes, the defendant was charged with forcible oral copulation as an accomplice. (*Id.* at p. 300.) However, while semen was found in and around the victim's vagina and rectal area, no semen was found in her mouth. (*Id.* at p. 302.) The defendant argued at the preliminary hearing that the prosecution had no independent evidence of the corpus delicti of forcible oral copulation. The magistrate agreed and did not hold him to answer for that crime. The defendant then filed a motion under section 995 to set aside the subsequent information that charged the defendant with forcible oral copulation notwithstanding the magistrate's ruling. The trial court denied the motion, finding the prosecution's corpus delicti burden had been met. (*Id.* at pp. 300-301.)

Our Supreme Court agreed with the trial court, explaining: the victim "was found some 10 feet from the roadway on a dirt median. She had been shot in the head and was alive when found, but died shortly thereafter. Medical experts found bruises on her thighs, knees, legs, and perineal area. She also exhibited injuries on her hands. Results from the sexual assault kit revealed the presence of semen inside her vagina, on her external genitalia, and in her rectal area. No trace of semen was found in [the victim]'s mouth; an expert testified, however, that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen. [The victim] was not wearing underpants, a brassiere, or shoes. Evidence showed she customarily wore such clothing." (*Jones*, *supra*, 17 Cal.4th at p. 302.) The court continued: "Keeping in mind the low threshold of proof required to satisfy the corpus delicti rule, we conclude that the magistrate erred in finding this low threshold was not met by the evidence presented at the preliminary examination. The state of the victim's

9

clothing (no underwear or shoes) and the forensic evidence (semen in the victim's vagina and on her external genitalia and anus) indicates multiple sexual acts occurred. That the victim was forcibly abducted, beaten, shot in the head, and left by the side of the road for dead gives rise to an inference that the sexual activity that occurred was against the victim's will. This circumstantial evidence of multiple forcible sexual acts sufficiently establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency." (*Ibid*.) The court also rejected the defendant's argument "that the lack of evidence of the *specific* loss or harm," i.e., the fact that no semen was found in the victim's mouth, "is fatal to the establishment of the corpus delicti" of forcible oral copulation. (*Ibid*.) Relying on *Jennings*, *supra*, 53 Cal.3d 334, and *Robbins*, *supra*, 45 Cal.3d 867, which we discuss immediately below, the court held the corpus delicti requirement is "not so strict." (*Jones*, *supra*, 17 Cal.4th at p. 302.)

In *Jennings*, *supra*, 53 Cal.3d 334, the defendant, who was convicted of multiple murders, challenged an accompanying rape conviction as unsupported by sufficient evidence of the corpus delicti. (*Id*. at p. 366.) Our Supreme Court found the evidence, although "minimal," to be sufficient, explaining: "The evidence shows that the victim . . . was found, unclothed, in an irrigation canal. She had been dead several weeks. Although her body was badly decomposed, experts determined she had suffered a broken jaw. While this evidence would satisfy the corpus delicti of murder (there being evidence that she died through the involvement of a criminal agency), the evidence of rape was not strong. For example, because of the advanced state of decay, there was no evidence of seminal fluids on the body [citations], or evidence of penetration [citations]. Further, there was no evidence that the victim's clothes were arranged in such a manner as to suggest a sexual assault. [Citation.] [¶] Although the evidence of rape is thus minimal, we nevertheless deem it sufficient to satisfy the corpus delicti rule. When the body of a

10

young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm. . . . [¶] While the inference of sexual activity is by no means the only, or even the most compelling, one in this case [citation], it nevertheless remains a *reasonable* one, at least for corpus delicti purposes. Further, it is important that the victim was found in a location where her lack of clothing was not easily explainable, that she was dead, and that she had suffered a broken jaw. From these factors, we may infer that whatever sexual activity occurred, it occurred against the victim's will. The evidence thus satisfies the second prong of the corpus delicti rule, i.e., the involvement of a criminal agency." (*Id*. at pp. 367-368.)

Similarly, in *Robbins*, *supra*, 45 Cal.3d 867, another murder case, our Supreme Court held the following to be sufficient independent evidence of the corpus delicti of lewd or lascivious conduct with a child: "Defendant was seen by one witness riding a motorcycle in the area of (and on the date of) the victim's disappearance, and the victim was last seen by another witness riding a motorcycle with a man matching defendant's description; no clothes were found at the scene of the crime; defendant's own experts described his 'primary diagnosis' as pedophilia; his admission of similar sexual conduct as to the very similar Texas crimes was confirmed by scientific evidence; and finally, the physical evidence of the homicide lends reliability to other aspects of defendant's confession, namely, his description of the lewd and lascivious conduct. In view of the nature of the offense and the circumstances of this case (i.e., the body was not discovered for some time, hence it was impossible to verify the sexual conduct by scientific evidence, and there were apparently no eyewitnesses to the crime) we do not believe the corpus delicti rule can be interpreted to call for more; the law does not require impossible showings." (*Id*. at p. 886.)

11

Returning to *Jones*, *supra*, 17 Cal.4th 279, our Supreme Court stated: "As *Jennings* and *Robbins* demonstrate, we have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Id*. at p. 303.)

Here, defendant challenges the sufficiency of the evidence, independent of his confession, to establish the corpus delicti of sexual penetration with a child who is 10 years of age or younger. (§ 288.7, subd. (b).) Conviction of this crime requires proof that (1) the defendant engaged in "the act of causing the penetration, however slight, of the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object" (§ 289, subd. (k)(1)), and (2) the defendant did so "with a child who is 10 years of age or younger" (§ 288.7, subd. (b)). There can be no doubt the crime is sufficiently established, beyond a reasonable doubt, when his confession is considered. He admitted to intentionally penetrating D.C.'s vagina with his finger. There is no dispute D.C. was eight years old at the time. And based on defendant's statements in his confession and his conduct both before and after the penetration, i.e., touching M.C. inappropriately before the penetration and attempting to have sex with D.C. immediately thereafter, the jury could have reasonably inferred defendant's purpose in so penetrating was sexual arousal.

However, in order for defendant's confession to be considered for its full value to strengthen the case on all issues (see *Alvarez*, *supra*, 27 Cal.4th at p. 1171), there must be, independent of defendant's confession, "some slight or prima facie showing of injury,

loss, or harm by a criminal agency." (*Ibid.*) As in *Jones*, *supra*, 17 Cal.4th 279, *Jennings*, *supra*, 53 Cal.3d 334, and *Robbins*, *supra*, 45 Cal.3d 867, there is no direct evidence, aside from defendant's confession, that the specific prohibited act occurred. But that is not required. In *Jones*, the prima facie showing of injury, loss, or harm was supplied by circumstantial evidence that *other* sexual acts occurred, i.e., semen in and around the vagina and rectal area and the absence of underwear and shoes on the body. (*Jones*, *supra*, 17 Cal.4th at p. 302.) In *Jennings*, the fact that the victim's body was found unclothed in a remote location supplied the requisite circumstantial evidence that "*some* sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm." (*Jennings*, *supra*, 53 Cal.3d at p. 367, italics added.) And in *Robbins,* the lack of clothing on the body, evidence of the defendant's pedophilia diagnosis, and evidence substantiating his admission to other similar crimes supplied the prima facie showing of injury, loss, or harm. (*Robbins*, *supra*, 45 Cal.3d at p. 886.) In each case, circumstantial evidence that *some* sexual activity occurred, coupled with circumstantial evidence the activity was criminal, satisfied the corpus delicti requirement; the defendant's statement could then be considered for its full value to fill in the precise nature of the activity.

Here, there is a much greater showing. Unlike the foregoing murder cases, where the evidence of sexual activity was circumstantial, here, D.C. testified defendant touched her vagina on the bed. S.S. testified defendant was on top of D.C. on the bed, moving his hips up and down, while D.C. told him to "stop" and defendant responded: "Just go with it." M.C. testified defendant also touched her inappropriately, supplying direct evidence of the crimes committed against her and circumstantial evidence defendant also engaged in sexual conduct with D.C. (See Evid. Code, § 1108, subd. (a); see also *People v. Merriman* (2014) 60 Cal.4th 1, 40 [evidence of sexual assault cross-admissible under

13

Evidence Code section 1108 to show the defendant's propensity to commit rape and forcible oral copulation]; see, generally, *People v. Catlin* (2001) 26 Cal.4th 81, 145 [other crimes evidence admissible to prove corpus delicti].) Thus, we have both direct and circumstantial evidence of sexual activity engaged in by defendant against D.C., and since she was eight years old at the time, there can be no dispute the activity was criminal in nature. We hold this evidence is more than sufficient to provide a prima facie showing of injury, loss, or harm by a criminal agency, such that defendant's confession may be considered for its full value to fill in the precise nature of the crimes committed against D.C.

Nor are we persuaded by defendant's assertion D.C. "repeatedly denied that any such event occurred." In the SAFE interview, D.C. stated defendant "tried touching" her "private part," which she indicated was her vagina, in the bedroom while she sat on the bed. While he did so, defendant said, "just let me, just let me," to which D.C. said, "no" and was eventually able to run outside. D.C. then stated S.S. went to the gas station to call the police because defendant "kept on touching [her] there." She then said defendant was "trying to touch [her]." A short time later, D.C. said he did touch her vagina on top of her swimming suit three times while she told him to "stop" and tried to get away from him. The interviewer then asked D.C. whether defendant had done "anything else," whether he had touched her "any other time besides that time," and whether "anything else ever happened." To each question, D.C. answered: "No." She also said defendant did not use "any other part of his body," other than his hand, to touch her vagina. At trial, D.C. clarified defendant did not simply "try to touch" her vagina with his hand while she was on the bed; he did so, and continued to touch her despite her demand for him to stop. D.C. did not remember much of what she had previously told the SAFE interviewer. She did, however, agree with defense counsel's leading questions: "And

14

[defendant] never did anything else to you; isn't that correct?" and, "[i]sn't it true, [D.C.], [defendant] never put his finger in you, did he?" and "[Defendant] never gave you a piggy-back ride, correct?" When the prosecutor asked whether she understood what it meant to have something inside of her, D.C. answered: "No."

From the foregoing, it is apparent D.C. did not fully understand what defendant was doing to her on the bed. However, her testimony and statements in the SAFE interview, along with S.S.'s eyewitness testimony, provide more than enough independent evidence that she suffered some injury, loss, or harm by a criminal agency. Her description of being touched on the bed corroborated defendant's statement to police concerning the same conduct, although we know from his statement that he actually pulled her swimming suit to the side and tried to insert his penis in her vagina. In turn, this corroboration lent reliability to defendant's additional confession that he also penetrated D.C.'s vagina while giving her a piggyback ride down the hallway, which he admitted turned him on and probably caused him to then try to have sex with her in the bedroom. Based on this corroboration, we are confident defendant confessed to the penetration, not because of "improper police activity or [his] mental instability" (*Jennings*, *supra*, 53 Cal.3d at p. 368), but because it actually happened. Nor are we troubled by the fact D.C. did not remember the piggyback ride. She was eight years old at the time of these crimes. By defendant's own statement, the actual penetration while D.C. was on his back was a fleeting event and the penetration was slight.

We conclude there was sufficient evidence, independent of defendant's confession to police, to establish the corpus delicti of sexual penetration.

## II

### *Exclusion of Impeachment Evidence*

Defendant also claims the trial court abused its discretion and violated his right to due process by excluding evidence certain school records pertaining to S.S. indicated he exhibited oppositional, defiant, and atypical behaviors purportedly relevant to his credibility as a witness. We disagree.

### A.

### *Additional Background*

Defendant subpoenaed S.S.'s school records that the trial court reviewed in camera. Certain of these records were made available to defense counsel. The prosecution then asked the trial court to limit cross-examination of S.S. concerning a psychoeducational study (PS) prepared in May 2011. The prosecution asked the trial court to preclude, as "irrelevant and unduly prejudicial," any questioning concerning the following contents of the study: "[R]eferrals for '[in]subordinate and defiant' behavior; [¶] Anger outburst when frustrated over academics or social injustices; [¶] Demonstrating victimizing behaviors; [¶] Seizures, setting fires, and thoughts of suicide; [¶] Prior diagnoses and use of medication to control behavior; [¶] Conclusions based on limited hearsay that suggest potential for maladjustment including: cruelty to animals, threats to hurt others . . . , bullying classmates, and other aggression and conduct problems." The prosecution did not, however, object to cross-examination concerning two reported incidents of theft at school and requested a hearing under Evidence Code section 402 to determine whether a reported statement made by S.S. to the school psychologist, i.e., that he sometimes heard voices in his head that no one else could hear, would be relevant to his perception of defendant's behavior on August 2, 2011.

Prior to defense counsel's cross-examination of C.C., the first witness called by the prosecution, defense counsel raised the issue of addressing the foregoing subjects with this witness. The trial court ruled S.S.'s "oppositional, defiant behavior at school that is reflected in the [PS] doesn't seem to me to have any bearing on his truth or veracity." The court also ruled such evidence inadmissible under Evidence Code section 352 as an "unduly prejudicial" attack on S.S.'s character. The trial court did, however, indicate that defense counsel might be able to cross-examine S.S. concerning "his self-report of hearing things that might not be there" and the "specific incidents of . . . theft."

During S.S.'s testimony, defense counsel again raised the issue of questioning him concerning his oppositional and defiant behavior at school. Defense counsel argued: "I suspect [defendant] is going to get on the stand, deny that any of this happened, absolutely deny it. And so ultimately, I have got to come up with a theory for the jury as to why these children would make up allegations against their babysitter who they had no problems with in the past. [¶] And certainly seems to me with [S.S.], who is the oldest of the children and the only one that's allowed to leave the property on a bicycle -- the rest of the children weren't -- it seems to me I should be able to ask that, if the response is merited, about the fact he was defiant to authority and didn't like to listen to other people, especially people in position[s] of authority." The trial court again ruled the evidence inadmissible as irrelevant to the question of "whether this witness is telling the truth or not" and also barred by Evidence Code section 352.

S.S. was then questioned about the two reported thefts. He admitted one of them. He was also questioned about his reported statement that he was hearing voices no one else could hear. He denied making this statement. The parties stipulated the school psychologist would testify that S.S. made the statement.

17

## B.

### *Analysis*

Defendant asserts the jury should have heard that S.S. "'had numerous referrals and suspensions for [in]subordina[te] and defiant behavior'" at school, a teacher noted he "'will have anger outbursts when he becomes frustrated over academics or social injustices[,] struggles on the yard and in small group situations[,] and he often demonstrates victimizing behaviors,'" his "'primary disability is Emotional Disturbance,'" he was "identified as showing 'Oppositional Defiant Disorder and Bipolar Disorder,'" his mother was "'recently having more difficulty helping [him] control his behavior,'" he had been "'receiving therapy for one month . . . but [was] not presently taking medication,'" "parent and teacher responses suggested 'a high level of maladjustment for . . . aggression' [and] that he 'often threatens to hurt others and bullies others,'" he "sets fires," he "'almost always is easily annoyed by others' and 'threatens to hurt others,'" and parent and teacher responses also suggested "'a high level of maladjustment for . . . atypicality (seems out of touch with reality, has strange ideas, says things that make no sense, acts strangely, seems unaware of others).'" He argues the foregoing evidence "was highly relevant to the jury's assessment of whether his report of what he saw in the bedroom was one of his 'strange actions'—a product perhaps of his anger, defiance, or lack of contact with reality." We are not persuaded.

We first note the foregoing evidence falls into two categories: (1) evidence of S.S.'s past misconduct, i.e., insubordinate, oppositional, defiant, aggressive, threatening, and victimizing behavior; and (2) evidence S.S. appeared to be out of touch with reality. With respect to the second category, aside from the report of S.S. hearing voices no one else could hear, which was admitted into evidence, defense counsel did not ask the trial court to admit this evidence. Accordingly, any claim of error based on this category is

18

forfeited.[6]  (Evid. Code, § 354, subd. (a); see, e.g., *People v. Panah* (2005) 35 Cal.4th 395, 481.)  We therefore address only the first category.

####    1.    *Relevance of the Proffered Evidence*

"No evidence is admissible except relevant evidence" and, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, §§ 350, 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

"Not all past misconduct has a 'tendency in reason to prove or disprove' a witness's honesty and veracity."  (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.)[7]  It is misconduct "involving moral turpitude" that "may suggest a willingness to lie [citations], and this inference is not limited to conduct which resulted in a felony conviction."  (*Id.* at pp. 295-296.)  Thus, "the admissibility of any past misconduct for impeachment is

---

[6]    In any event, even if properly preserved for review, while evidence S.S. seemed out of touch with reality about three months before defendant tried to have sex with his sister would be relevant to his ability to perceive the event (see Evid. Code, §§ 210, 780), and further assuming the evidence was not subject to exclusion as inadmissible hearsay or under Evidence Code section 352, we would nevertheless conclude any error was harmless since the jury heard evidence S.S. reported hearing voices no one else could hear.  This additional, non-specific, evidence that parent and teacher responses revealed S.S. seemed out of touch with reality, had strange ideas, said strange things, acted strangely, and seemed unaware of others would have added little to the jury's assessment of his ability to perceive the event that occurred on his bed.  Moreover, the evidence against defendant was overwhelming.  Indeed, defendant's admission to trying to have sex with D.C. on the bed corroborated S.S.'s testimony and confirmed he accurately perceived the event.

[7]    Evidence Code section 786 "prohibits the use of evidence showing traits of a witness's character 'other than honesty or veracity.'"  (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 290.)

19

limited at the outset by the relevance requirement of moral turpitude." (*Id.* at p. 296; see also *People v. Clark* (2011) 52 Cal.4th 856, 931.)

Here, based on the offer of proof, we cannot conclude S.S.'s prior conduct rises to the level of moral turpitude, i.e., a "'general readiness to do evil.'" (*People v. Castro* (1985) 38 Cal.3d 301, 315.) While the assessment indicates S.S. "threatens to hurt others, teases others, argues [w]hen denied own way, bullies others, seeks revenge, hits and calls other adolescents names," we do not know precisely what S.S. did to warrant these comments. However, arguing, teasing, and name-calling certainly do not rise to the level of moral turpitude. Nor does committing a battery. (See *People v. Mansfield* (1988) 200 Cal.App.3d 82, 89.) Moreover, while the crimes of making a criminal threat (§ 422) and arson (§ 451) have been held to involve moral turpitude (see *People v. Thornton* (1992) 3 Cal.App.4th 419, 424; *People v. Miles* (1985) 172 Cal.App.3d 474, 482), S.S. was not convicted of these crimes. Instead, the school assessment simply notes, based on parent and teacher responses, that S.S. "threatens to hurt others." This does not reveal "[t]he knowing infliction of mental terror" held to be "deserving of moral condemnation" in *People v. Thornton*, *supra*, 3 Cal.App.4th at page 424. Similarly, the parent response that S.S. "sets fires" does not reveal whether he set fire to "any structure, forest land, or property," as those terms are used in the arson statute, or whether he did so "willfully and maliciously." (§ 451.) At most, the school assessment reveals a troubled young man who was acting out in school and at home, not a person possessing a general readiness to do evil, such that the jury could reasonably infer a willingness to lie. We agree with the trial court that this evidence was not relevant to S.S.'s credibility as a witness.

## 2. *Evidence Code Section 352*

Even assuming the evidence was relevant to S.S.'s credibility, we would nevertheless conclude the evidence was properly excluded under Evidence Code section 352. This section provides the trial court with discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We review the trial court's decision to exclude evidence under Evidence Code section 352 for abuse of discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) However, while this provision "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," it also "requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see *People v. Holford* (2012) 203 Cal.App.4th 155, 168 [section 352 objection should be overruled "unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger'" of one of the statutory counterweights].) Thus, Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of significant probative value to his defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599.)

We have already concluded the proffered evidence was not relevant to the issues presented. However, even if relevant, the probative value was slight. In *People v. Lightsey* (2012) 54 Cal.4th 668, our Supreme Court upheld the trial court's decision,

21

under Evidence Code section 352, to exclude evidence of a prosecution witness's misdemeanor conviction for assault with a deadly weapon, explaining: "[E]vidence of [the witness's] misdemeanor conduct—striking her ex-husband with a rock during a dispute—does not strongly demonstrate moral turpitude, i.e., a '"general readiness to do evil"' [citation], and thus would not have provided the jury much assistance in assessing [her] credibility. 'This was a routine matter of weighing the evidence's probative value against the probability its admission would "necessitate undue consumption of time" [citation], and the trial court's ruling was both reasoned and reasonable.' [Citation.]" (*Id.* at p. 714.) The same reasoning applies here.

The trial court did not abuse its discretion or violate defendant's right to due process by excluding the proffered evidence.

### III

### *Admission of Expert Testimony*

Nor are we persuaded by defendant's assertion the trial court abused its discretion and violated his confrontation, due process, and jury trial rights by allowing testimony from Dr. Anthony Urquiza, an expert on CSAAS.

In *People v. Bledsoe* (1984) 36 Cal.3d 236 (*Bledsoe*), our Supreme Court held expert testimony concerning the behavior of rape victims to be admissible under Evidence Code section 801 "to rebut misconceptions about the presumed behavior of rape victims," but not "as a means of proving—from the alleged victim's post-incident trauma—that a rape in the legal sense had, in fact, occurred." (*Id.* at pp. 248, 251.) In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our Supreme Court extended the *Bledsoe* holding to a case involving the sexual abuse of a child, explaining: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to

22

rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*Id*. at pp. 1300-1301; see also *People v. Bowker* (1988) 203 Cal.App.3d 385, 394; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956.)

In accordance with these principles, Dr. Urquiza testified regarding CSAAS, explaining the syndrome has five stages: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction or recantation. After going into each of the stages in some detail, with the exception of the fifth, Dr. Urquiza testified he was not there to render an opinion as to whether or not the alleged victims in this case were sexually abused, explaining: "That -- that would presume that I actually know information about this case. And even if I did know information about this case, I would not have an opinion about that because I'm not a member of the jury. So it is not my place to have any opinion about whether somebody was abused or not or whether somebody was a perpetrator or not." During cross-examination, defense counsel elicited testimony from Dr. Urquiza that CSAAS "is not a diagnostic tool," i.e., "not to be used to make a determination as to whether a child was abused or not," and it would be "improper use" of his testimony to try to use it to make such a determination. Dr. Urquiza then explained CSAAS is both "an educational tool for therapists" and "often is used to educate jurors about sexual abuse and to dispel myths or misunderstandings that they may have about sexual abuse."

Defendant argues, "the CSAAS testimony did not serve the purpose of rehabilitating a victim's credibility, mistakenly impeached by myths and misconceptions

23

about how child victims behave," but instead, because D.C. "testified that [defendant] never penetrated her and never brought his penis near her private part," which "was consistent with her pretrial statements," "[t]he function of the CSAAS testimony was to destroy [D.C.'s] credibility, a use never contemplated by the judicial precedents." We disagree. While D.C. testified only to the incident on the bed and agreed with defense counsel's suggestions that defendant "never did anything else," and "never put his finger in [her]," and "never gave [her] a piggy-back ride," and while this testimony generally conformed to the statements D.C. made during the SAFE interview, she still testified that defendant molested her; specifically, she testified that he touched her vagina on the bed and continued to do so despite her demand for him to stop, which defendant suggested through cross-examination and argument to the jury was inconsistent with her conduct after the incident. Use of CSAAS testimony to rehabilitate D.C. in these circumstances falls within the dictates of *McAlpin*, *supra*, 53 Cal.3d 1289.

For example, defense counsel asked D.C. whether she would have told somebody, perhaps her parents, one of her siblings, a teacher, *or a police officer*, if defendant had ever touched her inappropriately, to which she answered: "Yes." Later, defense counsel asked D.C. whether she remembered telling the police officer who spoke to her after the incident that "nothing happened" between her and defendant, and that she was simply "teaching [him] how to play the guitar." She did not remember telling the officer that, but admitted it would have been a lie. Defense counsel then asked whether defendant was able to see or hear her while she was speaking to the officer, to which she admitted defendant was not around. These questions were designed to, and did, elicit responses suggesting D.C. had no reason to lie to the police officer following the incident. Dr. Urquiza's testimony concerning secrecy and delayed disclosure was therefore needed to inform the jurors that such behavior is common among abused children—not to prove

24

D.C. was in fact abused by defendant, but to disabuse jurors of any misconception that a child's initial denial that any abuse occurred is inconsistent with that child having been abused. As Dr. Urquiza put it: "So the misperception that people have about sexual abuse is, if you are sexually abused, you will tell somebody right away. And while that does happen, it is not common for it to happen."

Moreover, contrary to defendant's argument on appeal, the fact D.C. did not reveal the sexual penetration during the piggyback ride or the fact defendant used his penis to try to penetrate her vagina, does not mean the CSAAS testimony was improperly used to "destroy her credibility." Instead, it was properly used to rehabilitate her credibility as to the abuse to which she did testify.

Defendant also takes issue with the following exchange between the prosecutor and Dr. Urquiza. The prosecutor asked: "What if an abuser sexually abused a child but did so in a playful or in a way that appeared loving to the child? Would that in any way possibly [a]ffect the way that child could disclose?" Dr. Urquiza answered: "I think it could. It may leave them with the notion about the question as to whether they were abused or some self-doubt about what the behavior was. I mean, some types of sexual behavior is difficult to mistake for anything else, at least for us as adults. But sometimes you can be wrestling, or you can be goofing around; and your hand can go someplace where it's not supposed to, and that is harder to figure out if you are a child. [¶] . . . So if it's not a clear-cut behavior, sexually inappropriate behavior, it may not be easily understood by the victim."

Relying on *People v. Gilbert* (1992) 5 Cal.App.4th 1372, defendant argues: "The prosecutor's questioning and the expert's responses offered the profile of a child sexual abuser who disguises his abuses in playfulness or shows of affection and who exploits the child's inability to understand that such ambiguous behavior is in fact sexually abusive,

and a profile of a victim incapable of recognizing the full sexual meaning of the disguised act. This is not a permissible use of CSAAS testimony." We are not persuaded. Indeed, the expert testimony in *Gilbert* was held to be properly admitted and not outside the permissible scope of such testimony. (*Id*. at pp. 1384-1386.) However, the *Gilbert* court did explain: "Because the line between impermissible use of expert testimony to prove the child was abused, and permissible use of such testimony to '"explain the emotional antecedents of abused children's seemingly self-impeaching behavior . . ."' [citation], is by no means a bright one, the better practice is to limit the expert's testimony to observations concerning the behavior of abused children as a class and to avoid testimony which recites either the facts of the case at trial *or obviously similar facts*. [Citations.]" (*Id*. at pp. 1383-1384, italics added.)

Here, Dr. Urquiza limited his testimony to the behavior of abused children in general. Nor can we conclude the prosecutor's questions concerning abusers who use apparently playful or loving touches to disguise their abuse, or Dr. Urquiza's testimony that such behavior could confuse the abused child and cause the child to doubt whether he or she was actually abused, dealt with facts that were obviously similar to the facts of this case. Instead, this testimony was "targeted to a specific 'myth' or 'misconception' suggested by the evidence" (*People v. Bowker*, *supra*, 203 Cal.App.3d at p. 393), i.e., that a victim of child sexual abuse will both understand and immediately report such abuse. As we have already noted, D.C. did not immediately report the incident on the bed. And as defendant has repeatedly observed, she did not report the penetration during the piggyback ride. While the jury could not use Dr. Urquiza's testimony to conclude defendant abused D.C., and was so instructed, if the jury concluded from other evidence, e.g., his confession, that he did abuse the child, the challenged testimony could have helped the jury understand the reasons behind the delayed and incomplete disclosure.

26

This falls within the permissible purpose of such testimony, i.e., "showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Ibid.*)

We also reject defendant's assertions that Dr. Urquiza's testimony invaded the province of the jury, contradicted Evidence Code section 780 and CALCRIM No. 226, and was not needed to dispel any myths. We have already concluded the testimony was admissible to dispel the myth, which defense counsel attempted to exploit, that a child's initial denial any abuse occurred is inconsistent with that child having been abused. And while defense counsel's attack on D.C.'s credibility in this regard is supported by Evidence Code section 780, subdivision (h), allowing the jury to "consider" prior inconsistent statements "in determining the credibility of a witness," and while the jury was so instructed pursuant to CALCRIM No. 226, this does not mean expert testimony explaining that prior inconsistent statements are common in child sexual abuse cases—the implication being such statements may be of limited value in determining credibility in such a case—contradicts Evidence Code section 780 and CALCRIM No. 226. Indeed, both provide that the jury may consider *anything* that has *any tendency in reason to prove or disprove* the truthfulness of a witness's testimony. (Evid. Code, § 780; CALCRIM No. 226.) Prior inconsistent statements in general tend to disprove truthfulness, while CSAAS testimony explains the emotional antecedents of an abused child's prior inconsistent statement, and thus, tends to rehabilitate the witness, assuming, of course, the jury concludes from other evidence the witness was in fact abused. Nor did Dr. Urquiza's testimony invade the province of the jury. Indeed, he specifically stated he had no opinion as to whether the alleged victims in this case were abused or whether defendant committed any acts of abuse.

27

Finally, Dr. Urquiza's testimony did not violate defendant's confrontation, due process, or jury trial rights. Similar arguments were raised and rejected in *People v. Patino* (1994) 26 Cal.App.4th 1737, at pages 1746-1747. We agree with that decision.

## IV

### *Prosecutorial Misconduct*

Defendant further asserts the prosecutor engaged in prejudicial misconduct in violation of his right to due process by (1) misleading the jury about the evidence, (2) misleading the jury about a stipulation and suggesting facts not in evidence, (3) assuring the jury the case would not have been brought if the evidence was lacking, (4) implying defendant was not human, except for the moment when he confessed to police, and (5) appealing to the passions of the jury and disparaging defense counsel in front of the jury. This assertion of error is forfeited because defendant did not object to the prosecutor's alleged misconduct or request curative admonitions. (*People v. McDowell* (2012) 54 Cal.4th 395, 436.) Anticipating forfeiture, defendant argues reversal is nevertheless required because defense counsel's failure to object and request admonitions amounted to ineffective assistance of counsel. We disagree. Because the asserted instances of alleged misconduct were either not misconduct or not prejudicial, we conclude counsel's failure to object and request admonitions did not fall below an objective standard of reasonableness.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting

28

*United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

We must first determine whether defense counsel's failure to object to the specific instances of alleged misconduct fell below an objective standard of reasonableness. "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such '"unfairness as to make the resulting conviction a denial of due process."' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

The first instance of alleged misconduct occurred during the prosecutor's closing argument. Describing defendant's interview with police, the prosecutor stated: "This is when the officers are saying, [D.C.] is going to get examined; did you give her any STDs. Did anything go into her vagina that we need to know about *when her hymen broke*?

29

They explained that to him." (Italics added.) Defendant complains the prosecutor misled the jury about the evidence because there was no evidence D.C.'s hymen broke. While "mischaracterizing the evidence is misconduct" (*People v. Hill* (1998) 17 Cal.4th 800, 823), where the prosecutor's comments are ambiguous, the question is "whether there is a reasonable likelihood that the jury misconstrued or misapplied" the comments. (*People v. Clair* (1992) 2 Cal.4th 629, 663.) Here, "when her hymen broke" could be construed to indicate it did actually break, while the doctor who performed the sexual assault examination on D.C. testified there were no findings of sexual trauma. However, the prosecutor was clearly referring to defendant's police interview, in which defendant was asked whether he penetrated D.C.'s vagina "however slight," because any such penetration "breaks the hymen." Viewed in context, we conclude the jury likely understood the challenged language to refer to the detective's suggestion to defendant that D.C.'s hymen broke, and not that the hymen was in fact perforated. So viewed, the challenged statement did not mischaracterize the evidence and defense counsel was not ineffective for failing to object.

Second, defendant claims the prosecutor misled the jury about the stipulation entered into between the parties, i.e., the school psychologist would testify S.S. told her on one occasion in May 2011 that "sometimes he heard voices in his head that no one else could hear." The prosecutor stated during her closing argument: "[S.S.] told -- allegedly told a school psychologist -- a school counselor that he heard things that no one else could hear. And, first of all, there is a stipulation that, if she were to take the stand, she would have said that. But you can't just assume that it is true just because she would say that. She was not subject to cross-examination. She did not give you the context under which that statement was said. She didn't tell you any of the good things that possibly she knows about him either. The fact that that fact was given -- that she would

testify to that single fact in isolation doesn't tell you you have to believe it. It is just a fact that you can consider [of a statement] that he made in 2011."

Defendant argues the prosecutor "implied to the jury that defense counsel was preventing cross-examination and the elicitation of testimony helpful to the prosecution" and "suggested there were facts not in evidence, favorable to the prosecution, to which the absent witness would have testified." We disagree. A prosecutor "should not, of course, argue facts not in evidence" (*People v. Osband* (1996) 13 Cal.4th 622, 698), and "[w]here the circumstances do not indicate suppression of material evidence or any other impropriety in failing to call a witness, it may be misconduct for the prosecutor . . . to assert that a particular person, if called, would give certain testimony." (5 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 762, p. 1186.) Here, however, the prosecutor informed the jury that, while the stipulation created a conflict in the evidence as to whether S.S. told the school psychologist he heard voices no one else could hear, the stipulation did not resolve that conflict. If called as a witness, the psychologist would have testified S.S. made the statement; S.S. testified he did not. The parties did not stipulate that the psychologist's testimony would have been true. It was for the jury to decide who was (or would have been) telling the truth. Pointing this out to the jury was not misconduct. Nor was the prosecutor's subsequent comment that the stipulation provided limited information from which the jury could assess the psychologist's credibility. The only arguable suggestion of facts not in evidence was the comment that the psychologist might "possibly" know "good things" about S.S. But anyone might possibly know good things about anyone. This statement does not assert the psychologist actually had good things to say about S.S., or defendant somehow prevented her from sharing these good things with the jury. Defense counsel was not ineffective for failing to object to these comments.

31

Third, defendant complains the prosecutor stated during her rebuttal argument: "No evidence at all? I promise you, I would not be arguing in front of you that there was." Defendant argues: "The prosecutor's statement that she would not be arguing to the jury if she did not have sufficient evidence invites the jury to rely on the prosecutor's personal probity rather than on the evidence in the case and may be understood by the jury as an assurance that the prosecutor is relying on additional evidence." A prosecutor may not "express a personal opinion or belief in a defendant's guilt, where there is substantial danger that jurors will interpret this as being based on information at the prosecutor's command, other than evidence adduced at trial. The danger is acute when the prosecutor offers his [or her] opinion and does not explicitly state that it is based solely on inferences from the evidence at trial." (*People v. Bain* (1971) 5 Cal.3d 839, 848.) However, viewed in context, we cannot agree with defendant's characterization of the challenged statement as an assurance to the jury that there is sufficient evidence, perhaps outside that adduced at trial, to support defendant's guilt. The challenged statement was made in response to defense counsel's argument there was no evidence of sexual penetration, or that a piggyback ride took place. The prosecutor responded: "[W]hat are you expecting? A picture of the piggy-back ride? [¶] I -- at this point, you have the defendant's statement, and you have [the doctor's] exam; and, ladies and gentlemen, you need evidence that a crime occurred, however slight that evidence is. You got -- you'll get the instructions in the deliberation room. You have a lot of evidence that a crime occurred: Touching breasts, touching butt, touching vagina, being in a room with [D.C.], [S.S.] seeing him on top of her. . . . No evidence at all? I promise you, I would not be arguing in front of you that there was." Viewed in context, we conclude the jury likely understood the challenged statement to refer to the evidence the

32

prosecutor recited immediately before the statement. So viewed, there was no misconduct and defense counsel was not ineffective for failing to object.

Fourth, defendant takes issue with the following statement made during the prosecutor's closing argument, again referring to defendant's police interview: "And for a moment, the defendant becomes a human, and he starts to talk and gives this information up." Defendant argues: "By suggesting that [defendant] was human only for a moment, when he responded with admissions of wrongdoing to the officers' expressions of concern for the family, the prosecutor implied that [defendant] has behaved inhumanly since then. The prosecutor implied that, after that fleeting moment of humanity, [defendant] reprehensibly reverted to inhumanity by denying the truth of his admissions and demanding a trial, and thus implicitly invited the jury to chastise [defendant's] presumptuousness in demanding a trial. The argument thus infringed on [defendant's] constitutional trial right." The foregoing quote, with a single citation to the Sixth Amendment to the federal Constitution, is the entirety of defendant's argument. It is insufficient to raise the issue. (See *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [appellate brief must contain "meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error"].)

In any event, we disagree with defendant's characterization of the prosecutor's argument. No reasonable juror would have taken it as an invitation to hold defendant's decision to demand a trial against him. Moreover, while stating defendant was human only when he confessed does imply he was otherwise inhuman, we do not view this as misconduct. "Argument may be vigorous and may include opprobrious epithets reasonably warranted by the evidence. [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030; see also *People v. Terry* (1962) 57 Cal.2d 538, 561-562 [reference to the defendant as an "animal"]; *People v. Jones* (1970) 7 Cal.App.3d 358, 362 [reference

33

to the defendant's "animalistic tendencies"].) Merriam-Webster defines "inhuman" to mean "lacking pity, kindness, or mercy." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 643, col. 2.) Defendant's crimes against D.C. and M.C. certainly qualify. We therefore conclude the prosecutor's comments were warranted by the evidence and amounted to vigorous but fair argument. Defense counsel was not ineffective for failing to object.

Finally, defendant asserts the prosecutor committed misconduct by appealing to the passions of the jury and disparaging defense counsel. The prosecutor stated during her rebuttal argument: "Can you imagine what that must feel like, to be an eight-year-old kid, with 12 adults -- 14 staring at her; and the most important person in her life on August 2, 2011, looking right at her. But, yet, [defense counsel], with his many years of experience, was able to twist her up. And how hard is that, to twist up an eight-year-old girl to the point where she is crumpled in her seat, unable to even talk about anything?" Additionally, defendant complains the prosecutor asked M.C. "how she felt there on the stand" and whether defense counsel's questions about her body made her "feel embarrassed," stated in her closing argument that the SAFE interview is different from trial, "where you have an experienced defense attorney doing leading questions and getting answers that they want out of a kid who is oftentimes trained to obey adults," and stated in her closing and rebuttal arguments that defense counsel went "on the attack" in cross-examining the children and also "attacked" their parents and the police.

It is improper for a prosecutor "to portray defense counsel as the villain in the case"; this is because a "defendant's conviction should rest on the evidence, not on derelictions of his [or her] counsel. [Citations.] Casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People*

34

*v. Thompson* (1988) 45 Cal.3d 86, 112.) In *People v. Turner* (1983) 145 Cal.App.3d 658, disapproved on other grounds in *People v. Newman* (1999) 21 Cal.4th 413, 422-423, footnote 6, and *People v. Majors* (1998) 18 Cal.4th 385, 410-411, the Court of Appeal held the prosecutor "overreacted" to defense counsel's cross-examination of the victim and engaged in misconduct by portraying defense counsel as "an additional villain who was attacking the victim." (*Turner*, *supra*, 145 Cal.App.3d at p. 674.) The same can be said of the prosecutor's argument here. However, as in *Turner*, we conclude the misconduct was harmless. (*Ibid*.) In light of the overwhelming evidence of defendant's guilt, there is no reasonable probability a result more favorable to the defendant would have been reached without the misconduct. (See *People v. Davis*, *supra*, 46 Cal.4th at p. 612.) For the same reason, even if we were to conclude defense counsel's failure to object to the foregoing statements fell below an objective standard of reasonableness, there would be no prejudice.

V

***Imposition of Consecutive Life Terms***

We do agree the matter must be remanded for resentencing. As defendant correctly observes, the trial court abused its discretion in imposing three consecutive life sentences pursuant to section 667.6 and rule 4.426 despite the fact he was not convicted of any "violent sex offenses as defined in section 667.6." (Rule 4.426(a); see § 667.6, subds. (d) & (e).)

Section 667.6, subdivision (d), provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." Subdivision (e) of this section lists the violent sex offenses for which full, separate, and consecutive

35

terms are required where separate victims or separate occasions are involved. (§ 667.6, subd. (e).)

Implementing this section, rule 4.426(a) provides: "Multiple violent sex crimes [¶] When a defendant has been convicted of multiple violent sex offenses as defined in section 667.6, the sentencing judge must determine whether the crimes involved separate victims or the same victim on separate occasions. [¶] (1) *Different victims* [¶] If the crimes were committed against different victims, a full, separate, and consecutive term must be imposed for a violent sex crime as to each victim, under section 667.6(d). [¶] (2) *Same victim, separate occasions* [¶] If the crimes were committed against a single victim, the sentencing judge must determine whether the crimes were committed on separate occasions. In determining whether there were separate occasions, the sentencing judge must consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect on his or her actions and nevertheless resumed sexually assaultive behavior. A full, separate, and consecutive term must be imposed for each violent sex offense committed on a separate occasion under section 667.6(d)."

Defendant was not convicted of any violent sex offenses defined in section 667.6. Thus, rule 4.426 was not applicable in this case. Instead, rule 4.425 applied. This rule states: "Criteria affecting the decision to impose consecutive rather than concurrent sentences include: [¶] (a) Criteria relating to crimes [¶] Facts relating to the crimes, including whether or not: [¶] (1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (b) Other criteria and limitations [¶] Any

36

circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences." (Rule 4.425.)

While the trial court did not state during the sentencing hearing that it was using rule 4.426 to impose consecutive terms, it did state it was "going to follow the recommendation of the probation report," which erroneously stated rule 4.425 was not applicable and analyzed the question of imposing consecutive sentences under rule 4.426. The trial court's analysis on the record also mirrored that of the probation report, analyzing only whether the crimes involved separate victims or the same victim on separate occasions. Indeed, the Attorney General concedes the trial court did not appear to exercise its discretion to impose consecutive rather than concurrent sentences under rule 4.425, rather than rule 4.426. We agree with this concession.

Notwithstanding the conceded error, the Attorney General argues defendant has forfeited the issue because he failed to object at the sentencing hearing. Anticipating this argument, defendant argues an objection was not required to preserve the issue because "the error is not in the manner of exercising but in the failure to exercise discretion." We need not determine who is correct on the forfeiture issue. Assuming the contention is forfeited, we agree with defendant's alternative claim that his trial counsel was ineffective for failing to object to the trial court's use of an inapplicable rule in determining whether to impose consecutive rather than concurrent sentences. Our Supreme Court has explained that "a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his [or her] client may be found incompetent." (*People v.*

37

*Scott* (1994) 9 Cal.4th 331, 351.) Here, defense counsel did not object to the trial court's use of an inapplicable rule to sentence defendant to serve three consecutive life terms. This failure to object fell below an objective standard of reasonableness under prevailing professional norms. And while the record would support the trial court's consecutive imposition of these terms under rule 4.425, we also conclude there to be a reasonable probability, i.e., a probability sufficient to undermine our confidence in the outcome, that one or more of these terms would have been imposed concurrently had the correct rule been applied. (See generally *Strickland v. Washington*, *supra*, 466 U.S. at p. 687.)

We therefore remand the matter to the trial court for resentencing with directions to exercise its discretion under rule 4.425 to impose consecutive or concurrent sentences for defendant's convictions.

## VI

### *Cumulative Prejudice*

Aside from the sentencing error noted immediately above for which remand is required, we have rejected each of defendant's assertions of error. Accordingly, his claim of cumulative prejudice requiring reversal of his convictions also fails.

## DISPOSITION

Defendant's convictions are affirmed. The matter is remanded to the trial court for resentencing with directions to exercise its discretion under rule 4.425 of the California Rules of Court in deciding whether to impose consecutive or concurrent sentences for defendant's crimes. Following resentencing, the trial court shall amend the abstract of judgment and forward a certified copy thereof to the Department of Corrections and Rehabilitation.

Pursuant to Business and Professions Code section 6086.7, subdivision (a)(2), the clerk of this court is ordered to forward a copy of this opinion to the State Bar upon

finality of this appeal.[8]  Further, pursuant to Business and Professions Code section 6086.7, subdivision (b), the clerk of this court shall notify defendant's trial counsel that the matter has been referred to the State Bar.


                                                               /s/

                                                              HOCH, J.


We concur:


               /s/

MAURO, Acting P. J.


               /s/

MURRAY, J.

---

[8]  Business and Professions Code section 6086.7, subdivision (a)(2), requires the court to notify the State Bar "[w]henever a modification or reversal of judgment in a judicial proceeding is based in whole or in part on the misconduct, *incompetent representation*, or willful misrepresentation of an attorney."  (Italics added.)  Here, the trial court and counsel seemed to be unaware the wrong rule was being applied at the sentencing hearing.