Filed 10/26/20  P. v. Love CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072488 |
| v. | (Super.Ct.No. RIF1803719) |
| IVINE BERNABE LOVE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  David A. Gunn and Charles J. Koosed, Judges.  Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

On appeal, defendant and appellant Ivine Bernabe Love contends (1) his conviction for oral copulation of his four-year-old daughter, Jane Doe, must be reversed because the corpus delicti was not established independent of his statements, (2) the order prohibiting him from having any contact with Jane should be stricken because the trial court failed to state any code section authorizing the order at the time of sentencing, and (3) the abstract of judgment must be amended to reflect the court struck the assessments and fees imposed under Penal Code[1] section 1465.8 and Government Code section 70373. We modify the no-contact order and order the abstract of judgment corrected; otherwise, we affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

Defendant and R.V. are the parents of three children; the oldest is Jane Doe (born April 2014). In June 2018, while R.V. was at her obstetrician's office, Jane freely exclaimed defendant "licked her like a dog." The two were in the bathroom, and Jane, who had just finished using the toilet, was waiting for R.V., who was using the toilet. R.V. confronted defendant about Jane's disclosure, but he denied it. Nonetheless, R.V. remained suspicious of him.

On August 5, 2018, R.V. and defendant argued. He told her he was "on drugs." She was concerned and tried to talk to him, but he gave her "the cold shoulder" and tried to end their conversation by simply saying, "'Yeah, you're right.'" At one point, she pinched his leg and slapped his chest. Defendant called the police; however, no arrest was made.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

On August 7, 2018, R.V. and defendant talked, but he seemed distant by the way he responded to her questions. When asked if he had anything to tell her, defendant said he had molested their daughter. R.V. asked specifically what he did to Jane, and he said he licked her vagina. R.V. became upset and angry, and was concerned for Jane. That night, R.V. told defendant that he could be punished for what he did and threatened to report him. The next day, R.V. tried to talk to defendant about their relationship and Jane, but he said he had nothing to say and told her to call the police. R.V. did not call the police because she was a stay-at-home mom and was worried about "what life was going to be like without [defendant's] financial support."

On August 9, 2018, a "CPS worker" made a checkup call following the domestic violence incident on August 5. R.V. reported defendant's disclosure, and the worker called the police. In a recorded conversation, R.V. told Officer Rosenblum about defendant's admission of his molestation of Jane. When the officer asked R.V. what defendant specifically said to her, she replied, "'He ate her out.'" More specifically, she stated that defendant said, "'He licked her clit and vagina.'" R.V. said that defendant had done this approximately one year earlier and that Jane stays with her. R.V. explained that she had not called the police because defendant was the family's main support. R.V. also told the officer that Jane had previously said, "'Papi licked me like a dog. But I had a dream and monkeys, and I don't know.'"

3

Defendant moved out of the house. On August 9, 2018, Detective Garcia arranged for R.V. to make a pretext call to defendant on the detective's department-issued cell phone. Defendant answered, but hung up. Two minutes later, R.V.'s call did not go through. Detective Garcia, with R.V.'s permission, subsequently text messaged defendant. He began: "'Papi, you don't want to talk to me anymore?'" After three messages, defendant responded with three separate messages: "'I tried talking to you. I wanted to help you before I left, but you only wanted me in jail.' [¶] . . . [¶] . . . 'Now that I am gone, you should talk to your family for help.' [¶] . . . [¶] 'Best advice I can give right now is get that child support.'" Detective Garcia, pretending to be R.V., countered: "'What am I supposed to do or think after what you told me about (Jane Doe)?'" Defendant replied: "'You made your choice. I hope all goes well for you, [R.V.]'"

To refocus defendant on the allegations, Detective Garcia texted: "'That's it. I don't know what to choose. We've been together for five years. I don't know what to do. You want me to go to the police? Is our love done?'" Defendant replied: "'I'm gone already. Choose yourself and the kids.'" Detective Garcia responded: "'So that's really it? That's the memory you want to leave for your children? What do I tell (Jane Doe) when she is older and asks why Daddy licked her? Not even going to try to fix it, not even for her?'" Defendant replied: "'I tried fixing it when I was being honest with you. You just wanted me to be punished. How am I supposed to fix anything if I'm locked up or end up killed? What did you expect from me then?'" Defendant added: "'I could have been working but I would have been sent away anyway.'" Detective

4

Garcia responded: "'Because that's what I really want; right? Whatever. If you're done, you're done. I'll figure it out on my own.'" He added: "'This is how it is now.'" Defendant answered: "'Exactly, because it's what you really wanted.'"

Several hours after his last message and thinking that he was still texting R.V., defendant messaged Detective Garcia's phone: "'Life feels like nothing without you guys right now. I'm sorry for everything.'" Since the text was sent to the detective's work-issued cell phone, and the detective had ended his work day, he did not see it until he arrived for work the next morning on August 10, 2018. Around 11:01 a.m., Detective Garcia, pretending to be R.V., texted: "'You have me so confused what to do. First you tell me you're done. Now you say you miss us. I've struggled all night with what to do.'" Defendant immediately responded: "'First thing, get the child support; second, ask about living with your grandma . . . or your sister. Ask [our roommate] if he would be willing to lend you money. Also to help out more, see if (Jane Doe) can stay with your sister for a while until you're more stable. I'm sure your grandma will have some love towards the boys, hopefully.'" A follow-up text repeated his advice that R.V. immediately get child support.

Shortly thereafter, defendant texted: "'So long as I'm not there, I will always miss you guys. I've done too much wrong to be with you guys. I'll keep supporting you guys with what I can.'" Detective Garcia replied: "'See, you say you miss us, but now you tell me what I need to do on my own. Which is it? Are we going to work this out or not?'" Defendant answered: "'I will always love you guys. You're my family and will stay that way in my heart.'" Detective Garcia countered: "'It just didn't seem you love

5

me anymore. You don't even show you want me anymore.'" Defendant replied: "'I have to leave. How can what I did be forgiven?'" The detective answered, "'I don't know, Papi. My heart is torn. We have so much history, but when you told me you licked (Jane Doe)'s vagina, I don't know what to do. People can be forgiven. I don't want to go to the police, but how will I know you won't ever do that again to her? Was it just that, or did you have sex also?'" Defendant responded: "'It was just licking.'"

Defendant asked why R.V. was texting from a different phone number, and Detective Garcia explained: "'I had to borrow this phone because mine is out of service. I had no other way of talking to you.' [¶] . . . [¶] . . . Can we just talk in person? I'm with my mom and the kids, and she can watch them for a bit.'" When there was no response for 40 minutes, the detective texted: "'See now you go back to not talking. I'm afraid of going back home.'" After advising R.V. to "'[g]et an Obama phone,'"[2] defendant texted that he did not have access to outlets for charging his phone and would contact her when he could. He added: "'You called the police on me. I can't go back home.'" Detective Garcia countered: "'You didn't answer me or wanted to talk. I didn't know what else to do.'"

Jane was interviewed; however, she made no disclosure. Tracking defendant's cell phone, the police located and arrested him at a San Bernardino homeless center. The

---

[2] The detective explained an "'Obama phone'" is "a phone for people in various income situations" that is "either at low cost or free of cost."

parties stipulated that pages 13 to 18 of Jane's testimony at the preliminary hearing would be read to the jury. Jane testified that "Papi" licked her like a doggy.[3]

On January 24, 2019, a jury convicted defendant of oral copulation with a child 10 years of age or younger. (§ 288.7, subd. (b).) The trial court sentenced him to state prison for 15 years to life.

## II. DISCUSSION

### A. *Sufficient Evidence of Corpus Delicti.*

Defendant contends there was insufficient evidence of oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b)), aside from his own statements, to satisfy the corpus delicti rule. We disagree.

---

[3] Relevant excerpts from the portion of the transcripts provide:
"Q. So, (Jane Doe), I had heard that somebody licked you like a doggy?
"A. Papi did that. [¶] . . . [¶]
"Q. Where were you inside?
"A. Um, in the room.
"Q. Which room?
"A. Um, [I., her brother]'s room and my room. [¶] . . . [¶]
"Q. What's this a picture of?
"A. A girl.
"Q. . . . And when you said Papi licked you like a doggy, can you show me—can you point on there where Papi licked you like a doggy?
"A. I don't know. [¶] . . . [¶]
"Q. Okay. Did you have clothes on or off or something different?
"A. On. [¶] . . . [¶]
"Q. . . . Did you tell anybody about Papi licking you like a doggy?
"A. No. [¶] . . . [¶]
"Q. Okay. What about your mommy? Did you ever tell your mommy about that?
"A. No. [¶] . . . [¶]
"Q. All right. Okay. So is there anything you want to talk about with—about Papi licking you like a doggy?
"A. No."

7

*1.      Further background information.*

Prior to trial, defense counsel moved to set aside the information pursuant to section 995 on the grounds Jane's statement was insufficient to establish corpus delicti. Following argument, the trial court denied the motion.

The issue was raised again when defense counsel moved for a judgment of acquittal under section 1118.1. Counsel asserted that Jane's statement (defendant "'licked me like a dog'") was (1) inconsistent, in that her testimony at trial denied any oral copulation, and (2) vague, in light of her failure to identify where the licking occurred, and her statements about dreams and animals, that her clothing was on, and that it was not her vagina. The prosecutor countered: "[W]e do have the fact that this child makes a statement that 'Daddy licked me like a doggy' in a private bathroom, in a private setting where mother and daughter are sharing a private moment involving their underwear being pulled on and off and peeing, which is a private act. And out of nowhere, the child, without question, without provocation, makes a statement that 'Daddy licked me like a doggy.'" Given the context of Jane's disclosure, the prosecutor argued there was "more than a slight inference" that the act of licking that occurred was "sexual in nature." The trial court indicated it was inclined to deny the defense motion, explaining, "corpus doesn't require a whole lot and certainly doesn't require proof as to every element."

During further argument, the prosecutor directed the court's attention to *People v. Jennings* (1991) 53 Cal.3d 334 (*Jennings*), in which the California Supreme Court affirmed the admission of the defendant's extra judicial statement that he had raped the

victim before killing her despite the absence of any independent evidence of sexual penetration. The only evidence suggesting a rape was the victim's unclothed body and broken jaw. Agreeing with the prosecutor, the trial court stated: "Yeah. If I'm going to equate our situation to that one—I mean you have this little girl who just blurts something out for no apparent reason in a situation that her and her mom were using the bathroom facilities, essentially exposing themselves, and that's when she decides to say something. [¶] I think that's enough . . . . I have to look at all the surrounding circumstances, not just the statement on its face. If I looked at just the statement on its face, you might prevail. But I think taking everything into consideration, it's sufficient. I appreciate your motion. . . . I'm going to deny it."

### 2.    *Applicable legal principles.*

"The corpus delicti rule requires some evidence that a crime occurred, independent of the defendant's own statements." (*People v. Ledesma* (2006) 39 Cal.4th 641, 721 (*Ledesma*).) "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant"; "some independent proof of the corpus delicti" is required. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.) "The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible." (*Id.* at p. 1171; see *People v. Sanchez* (2016)

9

246 Cal.App.4th 167, 173 [circumstantial evidence of criminal activity satisfies the corpus delicti rule].)  "The principal purpose of the corpus delicti rule is to ensure that a defendant is not convicted of a crime that never occurred."  (*Ledesma*, *supra*, 39 Cal.4th at p. 721.)  In other words, the evidence of unsupported extrajudicial statements is admissible, but conviction still requires independent proof of the corpus delicti.

We review the evidence to determine if this "'slight or prima facie standard'" has been met.  (*Jennings*, *supra*, 53 Cal.3d at p. 368.)  In reviewing the ruling on a motion for acquittal, we apply the substantial evidence test.  (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)

> 3.      *Analysis.*

The evidence that defendant orally copulated Jane came from his statements to R.V., Jane's private exclamation to R.V. that "'Papi licked me like a dog.  But I had a dream and monkeys, and I don't know,'" and Jane's testimony of the same at the preliminary hearing.  However, Jane later denied the claim when interviewed and at defendant's trial, and she stated that her clothes were on when he licked her.  Thus, on appeal, defendant contends Jane's statement was "simply too ambiguous" to establish that any crime occurred under CALCRIM No. 359 ("Corpus Delicti:  Independent Evidence of a Charged Crime").  He argues "[t]he licking may have been over sufficient clothing to make it not a crime," or "[i]t may have been to literally any other part of [her] body" and "[d]ogs certainly are not choosy in where they lick and the statement does not suggest a sexual organ as opposed to any other body part."

Relying on *Jennings*, *People v. Jones* (1998) 17 Cal.4th 279 (*Jones*), and *People v. Robbins* (1988) 45 Cal.3d 867 (*Robbins*), cases in which the California Supreme Court found sufficient evidence to support the corpus delicti of a sex offense, the People argue "the evidence sufficiently established the corpus delicti for oral copulation in violation of section 288.7, subdivision (b)." In *Jennings*, *supra*, 53 Cal.3d at pages 367-368, the victim was found nude and badly decomposed next to an irrigation ditch. The California Supreme Court rejected the argument that there was insufficient evidence of the corpus delicti of rape, stating that, although the evidence of rape was "minimal," it satisfied the corpus delicti rule. (*Id*. at p. 367.) "When the body of a young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm." (*Ibid*.) The fact that "the victim was found in a location where her lack of clothing was not easily explainable, that she was dead, and that she had suffered a broken jaw," led to a reasonable inference that "whatever sexual activity occurred, it occurred against the victim's will." (*Id*. at pp. 367-368.)

In *Jones*, the victim was found dying from a gunshot wound to the head. (*Jones*, *supra*, 17 Cal.4th at p. 302.) Medical experts "found bruises on her thighs, knees, legs, and perineal area," injuries on her hands, and semen inside her vagina, on her external genitalia, and in her rectal area. (*Ibid*.) No semen was found in the victim's mouth; however, an expert testified "that negative test results were not inconsistent with oral copulation because the mouth's natural rinsing processes eliminate semen." (*Ibid*.) The victim was not wearing underclothes, which she customarily wore. (*Ibid*.) The defendant

11

admitted aiding and abetting his accomplice's forcible rape and forcible oral copulation of the victim. (*Id*. at pp. 292, 300.) Rejecting the defendant's corpus delicti objection, the California Supreme Court stated: "[W]e have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Id*. at p. 303.)

In *Robbins*, *supra*, 45 Cal.3d 867, the six-year-old victim was last seen riding on a motorcycle with a blond man. Months later, his skeletal remains were found, his neck had been broken, and his remains were unclothed. The California Supreme Court found that the defendant's admission of sexually assaulting the victim was admissible under the corpus delicti rule. (*Id*. at pp. 885-886.) "Defendant was seen by one witness riding a motorcycle in the area of (and on the date of) the victim's disappearance, and the victim was last seen by another witness riding a motorcycle with a man matching defendant's description; no clothes were found at the scene of the crime; defendant's own experts described his 'primary diagnosis' as pedophilia; his admission of similar sexual conduct as to the very similar Texas crimes was confirmed by scientific evidence; and finally, the physical evidence of the homicide lends reliability to other aspects of defendant's confession, namely, his description of the lewd and lascivious conduct." (*Id*. at p. 886.)

Since the facts are undisputed, we are faced with the legal question of whether there was sufficient evidence to establish the corpus delicti of oral copulation. Section 288.7, subdivision (b), punishes any person who is 18 years of age or older and

12

engages in oral copulation with a child who is 10 years of age or younger. "Oral copulation is defined as any contact, no matter how slight, between the mouth of one person and the sexual organ of another. Penetration is not required." (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 80.)

Keeping in mind the low threshold of proof required to satisfy the corpus delicti rule as stated in *Jennings*, *Jones*, and *Robbins*, we conclude Jane's exclamation that "Papi" licked her "like a doggy," provides sufficient independent evidence defendant orally copulated her. The timing of Jane's exclamation (during a private moment in the bathroom) and the analogy of defendant's action (dogs are known to lick their own genitalia) establish "a prima facie showing 'permitting the reasonable inference that a crime was committed.'" (*Jones*, *supra*, 17 Cal.4th at p. 301.) Moreover, the prosecutor introduced evidence that R.V. did not leave Jane alone with defendant following her disclosure, and defendant left the family home and hid at a homeless center in San Bernardino after confessing his offense to R.V. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for acquittal.

B.      *The No-Contact Order Was Authorized.*

Defendant contends the no-contact order must be stricken since (1) it "cannot stand under section 136.2(i)(1)" because "there is no signed protective order, it did not apply automatically, and [it] would be limited in duration," and (2) it is unauthorized under "section 1202.05." We disagree but will modify the order.

13

## 1. Further background information.

On April 5, 2019, at defendant's sentencing, R.V. requested face-to-face contact for herself and her three children with defendant. Defense counsel offered no thoughts, but the prosecutor requested a no-contact order as to Jane due to the "nature of the charges." After confirming R.V.'s request for contact included Jane, the trial court expressed concern that prohibiting contact could cause more harm than allowing it. Recognizing that no-contact orders are meant to keep "individuals who have been victimized from being victimized again and again," the court preferred to "defer to mom." The prosecutor asked if there was a way to limit the type of contact to phone calls and letters only "for the first few years" and then revisit the issue later to allow "physical actual face-to-face contact in prison." In any event, neither the prosecutor nor the court wanted the contact to include talking about the case. Defense counsel suggested supervised contact where R.V. is always present. The prosecutor explained her apprehension, namely, "the possibility of influencing the child."

After further consideration, the trial court stated: "I've had cases obviously similar in nature wherein the victims, much older than [Jane Doe], come back after the fact and say none of this ever happened. I lied. [¶] In this case, all she made was the statement about being licked liked a puppy. So really it . . . boiled down to the statements [defendant] made to law enforcement . . . . I will feel a lot better if [at] this point we limit the contact just for her and that it's supervised by you . . . [¶] . . . until the appellate period ran and we know what was going to happen to his case. Let's say, for example, say he gets a new trial. I don't want her testimony to be impeached or influenced by her

14

parents or by [defendant].  [¶]  So if the case was upheld on appeal, and there were no more appeals and essentially that was going to be your sentence, I would feel a lot better about allowing the contact.  I guess that's what I'm kind of trying to get at, is preserving at least the integrity of what has happened so far.  [¶]  And if he does get a new trial, then that's fine. . . .  I'm going to order no contact with just [Jane Doe] for the time being.  And I will lift it and allow all contact—I'd be inclined to do that, let's say.  I'm not going to make any promises—after his appellate rights are over.  And certainly, I mean, I guess he can have habeas rights forever and a day.  I'd like to see the case be reviewed first because there are some viable issues. . . .  [¶]  . . .  [¶]  The Court orders no direct or indirect contact with Jane Doe . . . ."  The court failed to identify the legal basis for its order, and defendant did not object to the no-contact order.

> ### 2.      *Analysis.*

Section 136.2, subdivision (i), in relevant part, states:  "When a criminal defendant has been convicted of a crime . . . that requires the defendant to register pursuant to subdivision (c) of Section 290, the court, at the time of sentencing, *shall* consider issuing an order restraining the defendant from any contact with a victim of the crime.  *The order may be valid for up to 10 years*, *as determined by the court*. . . .  It is the intent of the Legislature in enacting this subdivision that the duration of any restraining order issued by the court be based upon the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and the victim's immediate family." (§ 136.2, subd. (i)(1), italics added.)

15

While defendant challenges the no-contact order on the grounds (1) the trial court never signed such order at the time of sentencing, (2) it did not "apply automatically, and would be limited in duration," and (3) it was not authorized under section 1202.05, he does not dispute that his conviction requires him to register as a sex offender pursuant to section 290, subdivision (c). Therefore, the trial court was authorized to issue a protective order against defendant, "restraining [him] from any contact with" Jane for up to 10 years. (§ 136.2, subd. (i)(1).)

Here, contrary to defendant's assertion, the trial court considered "the seriousness of the facts before the court, the probability of future violations, and the safety of a victim and [her] immediate family." (§ 136.2, subd. (i)(1).) When the issue of defendant's contact with Jane was brought up, the court stated: "Let me think about that for a minute and come back to it." Later, the court expressed concern "that prohibiting contact could cause more harm than . . . allow[ing] it." Weighing the fact that Jane is a "young child" who "probably doesn't realize what even happened to her was wrong" against "the idea that she never gets to see [defendant] again and grows up that way," the court expressed concern as to whether there is a "right answer to this question." It considered putting perimeters on the contact between defendant and Jane, i.e., "talking about the case," or mother supervising the visits. Recognizing the possible issues that could be raised on appeal, along with the possibility that contact between the two may result in Jane recanting her accusation, the court ordered defendant have no direct or indirect contact with Jane until "after his appellate rights are over."

The trial court did not specify the duration of the order.  Rather, it stated the order was set for the "time being" or until "[defendant's] appellate rights are over" in order to preserve the integrity of what happened in the court process thus far.  However, the court indicated that it was willing to revisit the order following defendant's appeal.  Since section 136.2, subdivision (i)(1), authorized and directed the court to consider imposing an order prohibiting contact with Jane, and the trial court intended to impose a no-contact order until defendant exhausted his appellate challenges to the verdict, we will modify (§ 1260 [authority to modify a judgment on appeal]) the court's order as follows:  "The defendant is restrained for a period of 10 years from any contact with the victim N.L. pursuant to Penal Code section 136.2, subdivision (i)(1)."  If defendant exhausts his appellate rights prior to the 10-year period, he may file the appropriate paperwork to request the no-contact order be lifted.

Having found that the no-contact order was properly issued under section 136.2, subdivision (i)(1), we need not decide whether it was authorized under section 1202.05, or whether defendant forfeited his objection.

C.    *The Abstract of Judgment Must be Corrected.*

The parties agree the abstract of judgment must be corrected because it erroneously includes the $40 court operations assessment (Pen. Code, § 1465.8) and the $30 conviction assessment (Gov. Code, § 70373), which the trial court waived.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [Where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls.].)  We may order correction of the abstract of judgment when it

17

does not accurately reflect the oral judgment of the trial court. (*Id*. at p. 185.) Therefore, we direct the trial court to correct the abstract of judgment by striking the court operations and conviction assessments.

## III. DISPOSITION

The trial court's April 5, 2019, no-contact order is modified as follows: "The defendant is restrained for a period of 10 years from any contact with the victim N.L. pursuant to Penal Code section 136.2, subdivision (i)(1)." The court is directed to (1) correct its sentencing minutes to include the modified no-contact order, (2) correct the abstract of judgment by deleting the $40 court operations assessment (Pen. Code, § 1465.8) and the $30 conviction assessment (Gov. Code, § 70373), (3) prepare an amended abstract of judgment reflecting the views and directions set forth in this opinion, and (4) forward a copy of the amended abstract of judgment to the appropriate correctional authorities. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

J.

We concur:

RAMIREZ

P. J.

SLOUGH

J.

18